CHARLES F. DIGGS, Preliminary Trustee of JOHN G. McCULLOUGH, DAVID G. McINTOSH, Permanent Trustee, and CHARLES F. DIGGS in his own right *vs.* JOHN G. McCULLOUGH, and ANNIE E. McCULLOUGH, his wife.

*Husband and Wife—Deeds—Consideration—Deed fraudulent in fact—Subsequent Creditors—Insolvent Trustee.*

Money earned by a married woman was handed over by her to her husband to be invested by him for her. This money, as he received it, was put along with his own, to his credit in bank, and was used by him in his business, without any promise or agreement by him to repay it to her. Subsequently the husband conveyed a farm to S. for the express consideration of $10,000 lawful money; and S. shortly afterwards conveyed said farm to the wife for " three hundred dollars lawful money, and for other valuable considerations." These deeds being afterwards im-

peached as made in fraud of the creditors of the husband, it was
HELD:

1st.    That the wife had no claim upon the money so received by
her husband from her, and could not maintain the position that
the farm was purchased in the first instance with her money, and
consequently belonged to her.

2nd.    That the deed to the wife, purporting to be for "three hundred
dollars lawful money and other valuable considerations," no con-
sideration of a different character could be set up or relied on to
maintain it.

3rd.    That no merely good consideration, however meritorious, as
contradistinguished from a valuable one, could be invoked to
rescue it.

4th.    That the evidence showed that the deeds were fraudulent in·
fact, and therefore could not be upheld on any ground.

5th.    That the husband's trustee in insolvency, representing all
the creditors, might sustain any proceeding which the creditors
might prosecute to vacate fraudulent conveyances made by the
insolvent.

6th.    That if the creditors represented by the trustee of the in-
solvent became such after the execution and recording of the
impeached conveyance, and the conveyance was made with the
intent to defraud those who should thereafter become creditors,
it might be successfully attacked by the trustee.

A deed, fraudulent in fact, cannot, by registration, be made effective
against subsequent creditors whom it was made to defraud. or
bar their right to impeach it.

APPEAL from the Circuit Court for Baltimore County,
in Equity.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., YELLOTT,
STONE, MILLER, IRVING, BRYAN, and McSHERRY, J.

---

Diggs *vs.* McCullough and Wife.

---

*Thomas W. Hall,* and *Wm. A. Fisher,* for the appellants.

The answers of both Mr. and Mrs. McCullough assert that the farm was purchased with money of Mrs. McCullough, as an investment for her, not that a gift was intended. Not only is such the condition of the pleadings, but the testimony of both Mr. and Mrs. McCullough fully corresponds in this respect with their answers. The deed can only be supported, therefore, by showing that there was a purchase, on behalf of Mrs. McCullough, with money which belonged to her.

Mr. McCullough received the money from her without any promise for re-payment or investment, and without any arrangement which would have constituted the relation of debtor and creditor between himself and his wife, even if it had been her separate estate. *Bayne vs. State,* 62 *Md.*, 102-6, 109; *Grover & Baker S. M. Co. vs. Radcliff,* 63 *Md.*, 500-2; *Far. & Mer. Nat. Bank vs. Jenkins,* 65 *Md.*, 248-251; *Jenkins vs. Middleton,* 68 *Md.*, 540.

The plaintiff has excepted to all the evidence introduced for the purpose of supporting the deed to Mrs. McCullough as one of gift. The burthen of sustaining it as a deed of gift would rest upon the grantee under it, and it would be necessary for her to show that the grantor was in prosperous circumstances, had ample means left, *in tangible property,* to pay his debts, and that the settlement was reasonable. *Sewell vs. Baxter and Wife,* 2 *Md. Ch. Dec.,* 455; *Bullett vs. Worthington,* 3 *Md. Ch. Dec.,* 104, 105-7; *Williams vs. Banks,* 11 *Md.,* 226-7; *Ellinger, et al. vs. Crowl and Wife,* 17 *Md.,* 375; *Grover & Baker S. M. Co. vs. Radcliff,* 63 *Md.,* 502.

A debtor cannot part with his tangible property and turn his creditors round to a recovery on that more difficult to be traced, and taken under execution. *Bullett vs. Worthington,* 3 *Md. Ch. Dec.,* 99; *Warner .vs.*

*Dove,* 33 *Md.,* 586-7 ; *Goodman vs. Wineland,* 61 *Md.,* 453 ; *Bump on Fraudulent Conv.,* 283.

While McCullough was engaged in conveying away his assets to his wife, his son, his brother-in-law and his sister, he was fostering his credit with Diggs and others, and obtaining from them all the coal which he could purchase. *May's Fraud. Conv.,* (68), (69), (521); *Taylor vs. Jones,* 2 *Atkyns,* 600; *Crossley vs. Elworthy, L. R.,* 12 *Eq.,* 165-7-8; *Mackay vs. Douglas, L. R.,* 14 *Eq.,* 120-1 ; *Moore, et al. vs. Blondheim, et al.,* 19 *Md.,* 175.

The intent to defraud future creditors by the transaction in question may well be inferred from his denuding himself afterwards of his other property, especially when considered in connection with his diligent use of his credit. *May on Fraud. Conv.,* 521, *and chap.* 3, *p.* 61.

If the deeds were contrived to defraud subsequent, as well as subsisting, creditors of McCullough, it is unnecessary to consider whether Mr. Diggs is to be regarded as a creditor whose debt was in existence at the date of the execution of the deed to Mrs. McCullough. The indebtedness from McCullough to Diggs was a continuous indebtedness. At no time was McCullough free from the debt, and the purchases made at any time merely extended the indebtedness which existed for the purchases which had been previously made. *May on Fraud. Conv.,* ch. 3, *p.* 61; *Whittington vs. Jennings,* 6 *Simons,* 493; *Paulk vs. Cooke,* 39 *Conn.,* 566, 572; *Madden vs. Day,* 1 *Bailey,* 337, 340; *Savage vs. Murphy,* 34 *N. Y.,* 508, 510; *Bump on Fraud. Conv.,* 315.

*John N. Steele,* and *I. Nevett Steele,* for the appellees.

The farm in controversy was purchased with money earned by Mrs. McCullough in her separate business of dress-making, carried on by her with the acquiescence

of her husband. Her earnings were largely invested by Mr. McCullough in houses in the city of Baltimore, and some of these houses were given in exchange for the farm, and the balance of the purchase-money netted, with McCullough's notes for $3000, which were all paid with Mrs. McCullough's earnings. That Mrs. McCullough's earnings were very large and her business very profitable, is fully proved.

The earnings of a married woman carrying on a separate business with the acquiescence of her husband, are, as against him, her separate property, and not liable to his marital rights, and since the Code, they are her separate property as against her husband's creditors. 2 *Story's Eq. Jur.*, secs. 1385-1387; *Bridges vs. McKenna,* 14 *Md.*, 267; *Barton vs. Barton*, 32 *Md.*, 223-225.

Upon the case made by the evidence Mr. McCullough received from his wife her earnings in her separate business, not by virtue of any marital right, but in a fiduciary capacity, for her benefit, and to invest for her; with these moneys so received from her he purchased the farm, and informed her that he had bought it for her; and it is contended for Mrs. McCullough that, under the circumstances of the case, the farm was equitably her's, and she had an equitable right to have it conveyed to her, as against the creditors of her husband. *Stevenson vs. Reigart*, 1 *Gill*, 1 to 28; *Jenkins vs. Bank*, 65 *Md.*, 248 *and* 249; *Bayne vs. Edelin*, 62 *Md.*, 100; *Hinkle vs. Wilson*, 53 *Md.*, 293; *Myers vs. King*, 42 *Md.*, 65; *Nat. Bank vs. Insurance Co.*, 104 *U. S.*, 66, 67, 68.

If the deed to Mrs. McCullough is to be regarded as a voluntary conveyance made to her by direction of her husband, it is certainly good and valid as against subsequent creditors of her husband and his trustee in insolvency. In truth, the deed was good even against the existing creditors at the time of its execution. Mr.

McCullough was not only not insolvent, but, on the contrary, was possessed of ample means to pay his debts and leave a large surplus, and the conveyance was, under the circumstances of the case, reasonable and proper. *Grover, &c. vs. Radcliff*, 63 *Md.*, 501, 502.

But in this case we are dealing only with subsequent creditors. There is not a debt now in existence which was owing by Mr. McCullough on the 5th of June, 1881, which was the day upon which the deed was recorded. All his then debts were paid long ago. That he was then solvent is proved not only by this fact, but by full and uncontradicted evidence showing his then assets to have been very much greater than his debts.

Now, the law as to the validity of a voluntary deed against subsequent creditors is well settled in this State. The *onus* rests on the parties assailing the deed to establish the fraudulent intent by satisfactory proof, and the testimony does not show with sufficient certainty the fraud alleged.

In the case now before the Court, there is no satisfactory proof, or in fact any proof at all, of this *intention* and *design* to defraud subsequent creditors. A proper and strongly obligatory motive for the conveyance is found in the facts that the farm was purchased with Mrs. McCullough's earnings in a laborious business, to which the best years of her life were dedicated; that she was told that it had been bought for her and supposed it was her's, and that when she learned that it had been sold to Slicer, she asked that it should be "returned to her." In this request, made under such circumstances, we think there was a just and proper motive for the conveyance, abundantly sufficient to account for and justify it. *Williams vs. Banks*, 11 *Md.*, 198; *Moore, et al. vs. Blondheim, et al.*, 19 *Md.*, 175; *Kane vs. Roberts*, 40 *Md.*, 593-4; *Matthai, &c., vs. Heather*,

57 *Md.*, 484; *Sexton vs. Wheaton*, 8 *Wheaton*, 248, 249, 251; *Graham vs. Railroad Co.*, 102 *U. S.*, 153; *Wallace vs. Penfield*, 106 *U. S.*, 260.

In Maryland the distinction between subsisting and subsequent creditors has always been maintained; and it is settled that one who gives credit after the recording of a deed has knowledge of its existence, and cannot assail it, except by proof that it was made with the intention to defraud subsequent creditors. Further, the doctrine, if it can be called such, contended for by the other side can only apply to cases where the grantor in the conveyance was insolvent at the time of its execution. Mr. McCullough, as has already been stated, was not insolvent. *Bump on Fraud. Conv.*, 322; *Anonymous*, 1 *Wall., Jr.*, 107; *King vs. Lancaster Bank*, 1 *Ohio State*, 1-9; *Moritz vs. Hoffman*, 35 *Illinois*, 553; *White vs. Sansom*, 3 *Atkyns*, 411-412; *Williams vs. Brooks*, 11 *Md.*, 249-250-251; *Kane vs. Roberts, et al.*, 40 *Md.*, 593-4.

McSherry, J., delivered the opinion of the Court.

On the twenty-seventh of September, eighteen hundred and eighty, John G. McCullough and wife executed a deed, conveying to Charles H. Slicer a farm lying in Baltimore County. The consideration set forth in the deed was "the sum of ten thousand dollars lawful money." On the fourth of June, eighteen hundred and eighty-one, Slicer conveyed to Mrs. Annie E. McCullough the same property for a consideration stated in the deed to be "three hundred dollars lawful money, and for other valuable considerations." In the spring of eighteen hundred and eighty-six, McCullough being insolvent made an assignment, for the benefit of his creditors, to his son George S. McCullough and Wilson Townsend. Proceedings in insolvency were thereafter instituted against him and he was adjudged an insolvent. Charles H. Diggs was appointed his

preliminary trustee. In that capacity Mr. Diggs on the thirteenth of December, eighteen hundred and eighty-six, filed a bill in equity in the Circuit Court for Baltimore County, against McCullough and wife, attacking the two deeds referred to as fraudulent and seeking to have them declared null and void. The defendants answered denying all fraud, averring that the conveyances were made "for ample and adequate" considerations which were "*actually paid;*" and insisting that the farm was purchased with the money of Mrs. McCullough invested for her therein by her husband. Subsequently Mr. Diggs personally became a party plaintiff in the case, and at a later date Col. D. G. McIntosh, the permanent trustee, was also made a plaintiff. The Circuit Court dismissed the bill and hence this appeal.

The two questions presented by the record are, whether these deeds are fraudulent, and whether the appellants are entitled to assail them. These questions, though somewhat interwoven with each other, will be considered separately.

Mr. and Mrs. McCullough were married on the twenty-fourth of February, eighteen hundred and fifty-six. She was then, and for nearly two years previously had been, engaged in the dress-making business. She continued it until eighteen hundred and sixty-five or six. According to her testimony she realized large profits which, after deducting her household and her business expenses, she placed in the hands of her husband to be invested by him for her. Mr. McCullough put this money, as he received it, along with his own to his credit in bank; checked upon it in the course of his business as a wood and coal dealer and used it precisely as he did that which he earned himself. There was no promise or agreement made by the husband to repay to the wife the money so given by her to

Diggs *vs.* McCullough and Wife.

him. During the course of her examination, after she had testified that she gave this money, in various sums and at various times just as she received it, to Mc-Cullough to invest for her as he saw fit; she was asked, "was Mr. McCullough at liberty from what you told him when you gave him the money, to use it, or such portion of it as he saw fit, in his business or not?" She answered, "I did not restrict him in any way at all." "What understanding, if any, or agreement was there between Mr. McCullough and yourself in reference to the money you gave him?" Answer, "No agreement whatever, he was to make the most of it in my favor; it was mine, and he was to make as much out of it as he could for me." It was decided in *Far. & Mer. Nat. Bank vs. Jenkins*, 65 *Md.*, 248; and in the still more recent case of *Jenkins vs. Middleton*, 68 *Md.*, 540, that under such circumstances as these the wife had no claim to the money so received by the husband from her. It ceased to be hers and became his. Mrs. McCullough cannot, therefore, maintain the position taken in her answer that the farm was purchased in the first instance with her money and consequently belongs to her. Not long after their marriage Mr. McCullough began to purchase real estate, the title to which he took in his own name, though he alleges that he paid for it with the money received from his wife. He exchanged this for a part of the farm now in controversy, and for the residue of that farm he gave his notes which were paid by him when due; and in this instance also he took the title in his own name. The farm was acquired in this way during the years eighteen hundred and sixty-one, sixty-eight and seventy. He purchased other real estate of which he was likewise the ostensible owner. In September, eighteen hundred and eighty, he conveyed the farm to Slicer. He testified that he received from Slicer in payment ten thou-

sand dollars in bonds. These bonds he treated as belonging to himself, and included them in a statement of his assets made up to show that he was solvent in May, eighteen hundred and eighty-one. Upon his examination as a witness he swore that in May, 1881, he "owned seventeen thousand dollars in bonds, ten thousand of the seventeen thousand were those I received for the farm," though in a former portion of his evidence he had distinctly stated that "the said bonds I considered the property of Mrs. McCullough." He kept these bonds in his possession, treated them as his own, however he considered them, until June, 1881, when, at his instance and request, Slicer conveyed the farm to Mrs. McCullough, and received back in payment from McCullough these identical bonds which Slicer had given McCullough the preceding September. Thus Slicer in June, 1881, had exactly the bonds he possessed before the conveyance of the farm to him in September, 1880; Mrs. McCullough had title to the farm, and McCullough had diminished his apparent assets ten thousand dollars, and parted with the ownership of the farm without receiving a single cent in lieu thereof. Slicer never took possession of the farm, and he received no rents from it. McCullough occupied it after the conveyance to Slicer in the same manner as before. This was the first step in a systematic scheme to defraud. In the face of these uncontroverted facts it would be idle to contend that the deed to Mrs. McCullough may be upheld by reason of an actual purchase having been made by her from Slicer in good faith and for a valuable consideration. The bonds, if they ever belonged to Slicer or to McCullough, were certainly not Mrs. McCullough's; and it is not pretended that she paid any money or delivered any thing of value to make up the consideration named in the deed from Slicer to her. Upon neither ground relied on in her

answer can the deed be supported against a creditor whose claim was then a subsisting one. It becomes necessary now to ascertain with what intent as to subsequent creditors these conveyances were made.

Closely following the conveyance of the farm by Slicer to Mrs. McCullough, and almost concurrently with it, property on the North-west corner of Park and Fayette streets in Baltimore, standing in McCullough's name, was conveyed by McCullough and wife to the same Charles H. Slicer, for a consideration of six thousand dollars *in bonds*—being part of the very same ten thousand dollars of bonds which had been availed of to effect a transfer of the title to the farm. About two years afterwards McCullough bought this same city property back *for his wife* from Slicer—the consideration being six thousand four hundred dollars—four hundred dollars in cash, and Mrs. McCullough's two promissory notes for three thousand dollars each, signed by herself and her husband, bearing five per cent. interest, and both being payable several years after their date. Before the conveyance of this piece of property to Slicer, McCullough had his coal office on the premises and he has continued it there ever since. He collected the rents from the dwelling after the deed was made to Slicer, and he paid the taxes. Whilst the title stood in Slicer's name, McCullough paid to the Gay street Savings Bank the interest on a mortgage held by the Bank on this identical property. This was, to say the least, very singular conduct, if Slicer in fact and in good faith owned the property.

Early in 1882, McCullough sold to his sister a house situated on McCulloh street, in Baltimore, but conveyed it to her husband John H. Meyers. McCullough alleges that in 1872 he received from his deceased brother's estate two thousand five hundred dollars in bonds which belonged to his sister Mrs. Meyers; that

he held them for her, collected the interest and invested it until the original principal and the invested interest aggregated four thousand four hundred and some odd dollars. In consideration of these bonds, which McCullough admits he did not dispose of until 1884, the deed was executed in 1882. At the date of this conveyance McCullough and his family occupied this house, and they have continued to do so ever since. He has paid no rent for it, his sister and her husband residing with him during every winter and fall, which, McCullough says, "I suppose was equivalent to the rent." Upon this property there is a ground rent of three hundred dollars. This together with the taxes amounting to one hundred dollars a year, McCullough has continued to pay, notwithstanding the conveyance to Meyers. Why he parted with the title to this property in exchange for bonds which he had no use for until two years later, though he had use for the house and did continue to occupy it, and to make payments of ground rents and taxes, which only an owner would have done, is not explicable upon any theory of good faith in the transaction.

In 1883 he sold for eight hundred dollars his McHenry street property, which he valued in his statement of assets at one thousand dollars. In 1884 he sold to the same John H. Meyers (his brother-in-law) a wharf property for ten thousand dollars, and received payment in four notes of Meyers, unsecured in any way, each for twenty-five hundred dollars, and all of them running some years. Meyers did not take possession of this property, but McCullough remained in its occupancy until February or March, 1886, under a rent, he says, of twenty-five hundred dollars a year, which included the annual interest on a seventeen thousand dollar mortgage. The last payment of rent was made by a transfer to Meyers of McCullough's horses and carts,

in March, 1886. Immediately afterwards these horses and carts passed into the possession of George S. Mc-Cullough, a young man of twenty-two years of age, son of the appellees. At the same time the coal yard and wharf property were occupied by this same son, to whom McCullough sold his entire stock of coal and wood *to be paid for as George S. McCullough could*. This stock of coal McCullough bought on credit, but a short time previously, and had not paid for at all. Meyers, the brother-in-law, in 1884. was master of a tug boat. He owned property, worth about five thousand dollars, in Havre de Grace; and McCullough says "I felt satisfied that if he did not have money at the maturity of the notes, that he could borrow it." It is most remarkable that one so circumstanced should have involved himself in the purchase of the wharf property for ten thousand dollars, subject to a mortgage for seventeen thousand dollars—or a total of twenty-seven thousand dollars—merely for the purpose of renting it to the person from whom he bought it.

In 1884 a property on the South-west corner of Pratt and Fremont streets, Baltimore, was conveyed by McCullough to the same John H. Meyers, in consideration of twenty-five hundred dollars. Fifteen hundred dollars of this, McCullough says he owed his sister from the estate of George S. McCullough, deceased; and for the difference Meyers gave his notes which have since been paid. The evidence given by McCullough renders it exceedingly improbable that his statement with regard to this transaction is correct. Property at the North-west corner of Pratt and Fremont streets, was sold by McCullough in 1886 to his son for two hundred dollars. In 1884 a mortgage for six hundred dollars on Pratt street property was exchanged for property in Anne Arundel County, the deed for which was made to McCullough's son. Some land

owned by McCullough in Virginia was also conveyed to Charles A. Slicer.

Having thus stripped himself of all his visible property, and having caused the titles thereto to be made to his wife, his son and his sister's husband, he resorted, when examined as a witness, to the most extraordinary statements to account for the disappearance of the bonds and other assets which he claimed that he owned on May 1st, 1881. He says that by August, 1884, he had lost thirty thousand dollars in stock speculations, and by the last of December, of the same year, over one hundred thousand dollars. The six thousand dollars in bonds which he says he received from Slicer for the Fayette street property, some of the Meyers' notes, the bonds belonging to his brother's estate, together with all the money which he could borrow, were swept away. All this large sum of money he says passed through the hands of a man named Sutton, now deceased, who had a desk in McCullough's office. Sutton sold the bonds and procured the notes to be discounted, but never gave McCullough a check for the proceeds; and McCullough, when furnishing Sutton with money to put up in margins, never drew a check therefor. Currency was used in all of these transactions, and there is not an entry on McCullough's books with respect to a single one of them. He admits that a large proportion of these heavy losses was made up of borrowed money, but when repeatedly pressed to give the name of but one person from whom he procured money for the purpose of thus speculating, he is compelled to confess his utter inability to do so. This is simply incredible. If he borrowed from any body for this purpose, it was impossible for him to fail to remember the name of at least *one* such person. But he does furnish the name of a person whose notes he had had discounted through Sutton. That person was Samuel J. Smith. McCul-

lough does not remember the amount of Smith's paper that he succeeded in having discounted, but he says "I mean to say that I owed him somewhere between five and six thousand dollars." When asked, in regard to this indebtedness, 160 red. q.: "Don't you know what amount has been taken up and paid by yourself?" he replied "I do not remember." "Can't you approximate the amount?" "I cannot." "Will your books show?" "They will not." "Where is Samuel J. Smith?" "I do not know, I have not seen him for over two months." "Do you know whether or not he is in Baltimore City?" "I have not seen him; I do not know." "Don't you know, in fact, that he is a fugitive from arrest under an attachment for contempt of Court, issued by the Court of Common Pleas of this city in the case in which he was adjudged an insolvent, after you yourself were so adjudged?" "*I heard so.*"

It is important at this point to notice briefly the character of McCullough's indebtedness to Diggs. At the time the deed for the farm was made to Slicer, McCullough owed Diggs a considerable amount. This indebtedness was due for coal purchased from Diggs. Their mode of dealing was as follows: at the end of each month McCullough would give his promissory notes to Diggs at four months for the purchases of the preceding month. This course was kept up without interruption until McCullough made an assignment, at which time he owed Diggs twenty-eight thousand three hundred and twelve dollars, and thirty-four cents. Whilst he was steadily and uninterruptedly stripping himself of his visible property, he continued to incur debts to Diggs and others, knowing perfectly well that when the end would be reached—when he had parted with all his property—these creditors would be hindered and delayed, if not entirely thwarted, by these conveyances, in securing payment of their claims. The

particular notes due by McCullough to Diggs at the time of the conveyance to Slicer were paid before Mc-Cullough's failure, but there was not a moment of time from 1878, when McCullough began to purchase from Diggs, till now, that he did not owe Diggs large sums of money.

These successive conveyances and pretended sales to which we have alluded, were but devices resorted to by McCullough to place his property beyond the reach of his creditors, subsisting and subsequent, whilst he continued in the full use and enjoyment of it himself. This is the direct result of his conduct and, of course, must have been so intended by him. The very methods to which he resorted, and the agencies which he employed, proclaim his fraudulent purpose. The appearance of Slicer in three of these transactions; the use of the very same bonds in two of them; the failure to produce Slicer as a witness, and to prove by him the reasons which induced him to become the purchaser of the farm and the Fayette street property, whereby he lost the interest on his bonds, whilst Mc-Cullough held them, and received no income from the property; and his acceptance of the joint unsecured notes of McCullough and wife, bearing five per cent. interest in payment for the city property, which he is said to have purchased with valuable bonds, yielding perhaps not less than six per cent. interest, are circumstances not reconcilable with good faith. The failure of McCullough to include these two notes to Slicer in his list of debts in the insolvent case carries with it the conviction that the notes never existed, because it is not pretended that they have been paid. His tangible property was transferred to his immediate family, but still remained in his possession and occupancy; his intangible assets were squandered, as he alleges, in stock speculations carried on for him by a person now

conveniently dead, and not a single memorandum of any of these margin deals produced or pretended to be extant. If these transactions with Slicer had been genuine and not merely simulated, he would have been called as a witness to prove it. His testimony would have been of vital importance, if it could have established the defendants' case. He was accessible and within reach of the Court's process at the very time McCullough was himself testifying. The omission,. under such circumstances, to produce him was but little . less than a formal confession of guilt.

Whilst there is no one specific test by which the existence of a fraudulent intent can, in every instance, be detected; there are certain well recognized badges or *indicia* (concisely stated in *Alex. Br. Statutes,* 383), that lead, with moral certainty, to its discovery, in spite of cunning and adroit devices to conceal it. We have given an outline of the *indicia* furnished by the evidence in this case; and we are constrained to say that it has rarely been our duty to pass upon a case involving such rank fraud—a plan so deliberately formed to cheat, defraud and baffle creditors, and so minutely carried into execution. These conveyances and pretended sales, and this secreting of assets, cannot be explained upon any other hypothesis than this. It is impossible, therefore, to escape the conclusion that from the very beginning McCullough entered upon a scheme to delay, hinder and defraud his subsisting creditors, as well as persons to whom he might thereafter become indebted; and that the deeds in question were executed in furtherance of that scheme.

An effort has been made to support this deed as a voluntary gift; but that cannot prevail. The deed purports to convey the farm in consideration of "three hundred dollars current money and other valuable considerations." It must stand, if it stands at all, upon

that and that only. No consideration of a different character can be set up or relied on to maintain it. If it is not founded upon a valuable consideration it must fall when attacked by one who has the right to assail it. No merely good consideration, however meritorious, as contradistinguished from a valuable one, can be invoked to rescue it. This doctrine has been repeatedly announced by this Court. *Betts vs. Union Bank of Md.*, 1 *Harr. & G.*, 172; *Baxter and Wife, et al. vs. Sewell*, 3 *Md.*, 334; *Mayfield, et al. vs. Kilgour, et al.*, 31 *Md.*, 246.

Besides this, if the deed was a voluntary one the defences taken by the parties to it in their answers are utterly untrue in fact. If it is a voluntary deed from the husband to the wife, it is clear she was not a purchaser of the farm from Slicer; and it is equally clear that, in the first instance, her money was not invested in it. But the deeds are fraudulent in fact, and therefore cannot be upheld on any ground. If it be conceded that this was a voluntary gift by the husband to the wife, being fraudulent in fact, it could not be permitted to stand.

We are now brought to the question whether the plaintiffs have a standing in Court to assail these deeds. The trustee in insolvency represents all the creditors, and may undoubtedly sustain any proceeding which the creditors might prosecute to vacate fraudulent conveyances made by the insolvent. If the creditors thus represented by the trustee became such after the execution and recording of the impeached conveyance, and if the conveyance was made with a view and with the intent to defraud those who should thereafter become creditors, there is no reason for holding that conveyances so made cannot be successfully attacked by the trustee. A subsequent creditor could maintain a proceeding of that kind, and there is no rule

of law which denies to the trustee of the insolvent the right to do the same thing.   In *Moore, et al. vs. Blondheim, et al.,* 19 *Md.,* 175, it was held "that a voluntary deed of a debtor may be impeached and set aside· by subsequent creditors, in cases where the deed is executed for the purpose of defrauding them; and it cannot be doubted that a deed of a solvent grantor, made and registered in the partial execution of a purpose to defraud subsequent creditors, would, as to such creditors, be declared invalid and void, upon the consummation of the fraud.   Upon principle it would seem that a deed, fraudulent in fact, could not, by registration, be made effective against such subsequent creditors, nor bar their right to impeach it."   We refer also to *Williams, et al. vs. Banks, et al.,* 11 *Md.,* 251; *Matthai, Ingram & Co., et al. vs. Heather, et al.,* 57 *Md.,* 484.

Our examination of the record before us has brought us to the conclusion that the deeds assailed in this case were executed with the intent to hinder and delay creditors, and to defraud persons who might become creditors thereafter; and that, in consequence, they are void and must be set aside.   The decree appealed from will accordingly be reversed, and the cause will be remanded, that a decree may be passed in conformity with this opinion. ·

*Decree reversed, and*
*cause remanded.*

(Decided 9th January, 1889.)

STONE, J., delivered the following dissenting opinion:

If the complainant can successfully assail the deed, which is the ground of this suit, he must do so for the reason that it was made with the intent to defraud *subsequent* creditors.

The deed was executed and recorded some years before the debt of the complaining creditor arose, and he

therefore does not stand in the attitude of an existing creditor.

Some contention has been made in the argument that the complainant should be treated as an existing creditor, because he continued to deal with the grantor, McCullough, after the debt which was due him at the time of the execution of the deed, was fully paid.

But I can see no distinction between the case of a creditor whose debt has been paid, and who afterwards again deals with the debtor, and any other creditor. In attacking deeds for fraud I think our decisions have always maintained a clear distinction between existing and subsequent creditors. As the claim of Diggs, the complaining creditor, which was in existence at the date of the deed, has long since been fully paid and satisfied, if he has any claim to relief it must be as a subsequent creditor only.

It is well settled in this State that a voluntary conveyance may be set aside by a subsequent creditor, *provided* it was executed with the design and intention of defrauding those who should thereafter become his creditors. *Matthai, Ingram & Co. vs. Heather*, 57 *Md.*, 484. But while the law is so stated very distinctly and emphatically, yet I find no case in this State where such a deed has been declared void against subsequent creditors, and very little authority defining the general principles that should guide us in endeavoring to search out such frauds. There have been, however, some decisions which I think worthy of special notice.

The case of *Williams vs. Banks*, 11 *Md.*, 250, was the case of an attempt to set aside a voluntary conveyance, and a majority of the Court in that case use very strong language in reference to the effect of our registry laws upon deeds of that character, and go so far as to say, "we cannot comprehend how a person who, at the time of becoming a creditor, is aware of the existence of a

deed, can, in any just sense be considered as 'disturbed, hindered, delayed or defrauded' by it. It seems to us to be a contradiction in terms to say, that a person is defrauded by an instrument when he deals with a perfect knowledge of its existence and of its effect;" and the opinion then goes on to state that the registry laws do give such notice.

Standing alone these expressions certainly seem to imply, that as a *subsequent* creditor has notice, by its registration, of the existence of a deed he could not be defrauded by it. But in another part of the same opinion the same Judges say that they do not wish to be understood, "as denying the right of *subsequent* creditors to invalidate a fraudulent deed when made with the intention and design to defraud those who should thereafter become creditors."

In *Kane vs. Roberts, et al.*, 40 *Md.*, 590, an attempt was made by a *subsequent* creditor to upset a deed as fraudulent and void against him. It was conclusively proved by the grantor himself that the deed was made for the purpose of defrauding certain *existing* creditors, and the *subsequent* creditor insisted that a deed that was *fraudulent in fact* was void against *subsequent* as well as existing crediors. In answer to this contention the Court said:

"While some of the authorities referred to sustain this proposition, we cannot hold them to be the law in this State in view of the decisions of this Court in the cases of *Williams vs. Banks*, 11 *Md.*, 250; *Cooke vs. Kell*, 13 *Md.*, 469; *Moore, et al. vs. Blondheim, et al.*, 19 *Md.*, 175. These cases hold that a voluntary deed, which is fraudulent in law, is void as against pre-existing creditors, and also that a voluntary deed, which is made with the design to defraud subsequent creditors, may be impeached by those so defrauded. But they also hold that, where a voluntary deed is

made without design to defraud subsequent creditors, and is recorded, it is valid against all subsequent creditors."

It seems to me that this is a succinct statement of the law on that subject as it exists in this State to-day. A deed may be fraudulent in fact, that is to say, made with the design to hinder, delay and defraud *existing* creditors, yet unless it was made with the intention and design to defraud subsequent creditors, these latter have no right to impeach it. They deal with the party with knowledge, either actual or constructive, of the existence of the deed.

It is very apparent from these cases, that in order to entitle a *subsequent* creditor to relief against a duly recorded deed, he must show something more than that the deed was fraudulent in fact as against existing creditors. He must show the intent and design to defraud those who might thereafter become his creditors. This fraudulent design must be shown by some declaration or acts of the party seeking to defraud. But as fraudulent conveyancers do not generally disclose their designs, we generally have to rely upon a scrutiny of their acts. Unless therefore the grantor has done something or said something from which we can reasonably infer that at the time he executed the deed, it was with the intent to defraud the subsequent creditors, the deed as to them, must stand.

It is the theory of the complainant, that the execution of the deed in controversy was the first step taken by McCullough, the insolvent, gradually to strip himself of all his property, and get the titles in members of his family, and so defraud his creditors. If we adopt this theory, its logical sequence must and will be, that all the conveyances which he subsequently made to members of his family, or connections, were fraudulent and void. There are several such referred

to in the record, but the parties claiming title under them are not parties to this cause, and we should thus determine upon the rights of parties without giving them the right to be heard. These subsequent conveyances may or may not be valid. But the validity of the deed of 1880 alone is for decision in this case; and although we have the right to look, and do look, at the subsequent acts of McCullough in order to throw light on his motives for the deed of 1880, yet the validity of any other deed must stand unaffected by this decision.

McCullough, the defendant, was a dealer in coal, and carried on that business in Baltimore for nearly thirty years before his failure. He married a dressmaker who carried on a profitable business for eight or ten years after they married, and all her earnings over necessary expenses she handed over to her husband. These earnings however were not given to him in such a manner as to establish the relation of debtor and creditor between them, nor were they taken for the purpose of investment for her, but they became legally his. In 1881 he procured the deed to be made from Slicer to her. He, McCullough, and his wife both depose that this was done at her request. But throwing their evidence on this point out of the question, the well established fact is that McCullough had received a considerable amount of money which she had earned, and it is equally well established that in 1881, McCullough was entirely solvent. Under these circumstances a settlement on his wife was commendable and proper. The solvency at that time of the defendant is shown by the evidence of his former bookkeeper as well as his own. It also is shown by the fact that there is no creditor of defendant here complaining except Diggs, and his *unpaid* debt did not arise until about 1885, four years after, and his, Diggs' claims were all paid up to

about that time, although the defendant was constantly dealing with him; nor was the settlement on his wife at all out of proportion to the means of the defendant. Diggs, the complaining creditor, was examined, and does not pretend to say that the defendant ever made any false statement to him, or led him into any error as to his condition. Indeed all he does say against the defendant is, that he, Diggs, sometimes lent him money at short dates, to pay his notes to him, Diggs. The solvency of defendant is also shown to have existed up to 1883, if not longer.

But in 1886 the defendant failed, and went into insolvency. His difficulties he says began in 1884, and it is certainly probable that they began some time before his failure. He attributes his failure to stock speculations, but at any rate he failed. When he found himself in failing circumstances some of his transactions may have been questionable. But even supposing that he may then have been guilty of fraud, it does not follow that every previous act of his was tainted with it.

If McCullough was solvent in 1880 and 1881, and if every creditor of his at those periods has been paid in full, and if his solvency continued until 1883, and if the settlement on his wife was not out of proportion to his means, and his wife had a meritorious, if not a legal claim upon him for such a settlement, and all these facts are proved, then something more must be shown besides the mere fact of a subsequent failure before such settlement can be set aside as fraudulent. But I can find nothing in this record to connect the deed of 1881 with his subsequent failure. There is no evidence whatever that I can see, going to show that the deed of 1881 was made with the " design and intent " to defraud subsequent creditors. There is not a particle of proof that the defendant ever made a false represen-

tation to one of his creditors, or held himself out to the world as better off than he really was. Under such circumstances I cannot say, that the design and intent of the deed of '81 was to defraud, hinder and delay his creditors. It is shewn by the executed deed of 1864, that the purpose existed to give this farm to his wife for sixteen years before it was done. There is no doubt that the defendant and wife executed and delivered to his brother George a deed for the property in dispute in 1864. It is equally certain that George deeded the property back to Mrs. McCullough, but never delivered the deed to her, or had it recorded. If the "design and intent," to defraud subsequent creditors by such deed existed, the defendant was singularly slow in putting his design into execution.

It is suggested that the deed to Mrs. McCullough cannot be supported because the *answers* of the defendants claim that it was her money that paid for the property, while the proof shows that it was his.

Admitting to the fullest extent the law as laid down in *Betts vs. Union Bank of Maryland,* 1 *Har. & G.*, 175, and *Cole vs. Albers & Runge,* 1 *Gill,* 412, that where a deed is impeached for fraud it will not be allowed to set up a *different* consideration from the one expressed in the deed in order to support it, that principle has no application to the case before us.

The consideration expressed in the deed from Slicer to Mrs. McCullough is "for and in consideration of the sum of three hundred dollars lawful money, and for other valuable considerations moving the same." This deed does express a money consideration and is a deed of bargain and sale, and the proof is that it was made for a valuable consideration. It is true that the consideration moved from the husband, but the deed in fact does not allege that the consideration moved from the wife. But the consideration was a valuable one.

Diggs *vs.* McCullough and Wife.

In *Cole vs. Albers*, the deed expressed on its face a money consideration, and upon proof that in fact no money was paid, the consideration of marriage was attempted to be set up to support the deed, and this, the Court said, could not be done, but they allowed in that case consideration of the *same kind* differing only in amount from that expressed in the deed, to be shown.

In this case we must deal with the deed itself and the proof, and if the defendants in their answers made a mistake *in point of law* in supposing that the money was hers, when it was legally his, that mistake cannot prevent the deed from operating as a voluntary conveyance, if otherwise good.

Another point made by the appellant is, that the consideration for this deed moving from the husband, the consequence is a resulting trust for the benefit of the husband, and that his creditors have now the right to take it. In this the appellant is in error.

Where the purchaser takes the deed in the name of his wife, the presumption is that a gift or an advancement was intended, and there is certainly nothing in this case tending to rebut such presumption. 1 *Perry on Trusts*, 142.

Recurring, however, to the main question in this case, which is one of fact, there are suspicious circumstances attending the conduct of McCullough subsequent to the deeds now in controversy. If these deeds are to be declared void it must be on account of his subsequent acts, for no one would claim that these deeds were void, viewing them as standing alone and disconnected with any subsequent conveyances; and before we can declare them so we must be convinced that these subsequent deeds were fraudulent, and it seems to me that our decision would in effect, say so, while the grantees are strangers to the case. The whole of the complainant's case rests upon the testimony of McCullough himself.

If the whole of his testimony were stricken from the record, the complainant would not have a shadow of a case. If we were totally to discredit the witness, the effect would be the same as if all his evidence was expunged. But the complainants have the right to ask us to test any portion of his evidence by probabilities, or facts, as we may be satisfied such facts exist, and this we are willing to do. But there is nothing improbable in the fact as deposed to by himself and, in part, corroborated by his former book-keeper, that he was *solvent* in 1881, or that at his wife's request he then made a settlement on her—a settlement that she had the right to ask, considering the amount of money she had given him, and which it was but just, if he was solvent, for him to make. It is consistent with every day's experience in the mercantile world that he, who is solvent one year, may be insolvent the next; and experience also teaches us the lesson, that as men become beset with difficulties they too often resort to expedients and acts that in their better days they would repudiate. I do not, therefore, think that McCullough's sale to Meyers, his brother-in-law, or his conveyance to his son, George, whatever we might think of those transactions, would be sufficient to invalidate a deed made four or five years before.

There is another consideration which I think is entitled to much weight in the decision of this case, and that is the question of time. McCullough parted with the title to this property in 1880, and the bill to set aside the deed was not filed until December, 1886, six years after the deed was duly recorded. Now a party is always allowed a reasonable time after the discovery of a fraud, or when with ordinary diligence he might have discovered it, to institute proceedings to correct it. Now Diggs, the complainant, had constructive knowledge of this deed in 1880, and yet continued to

deal with the defendant up to 1885, and his bills were paid up to that year. Diggs himself, for these four or five years, never supposed the deed was made with a design to defraud *subsequent* creditors, or he would not have continued to deal with McCullough. If McCullough had the design to defraud Diggs in the future when he made the deed, he gave him the full period, five years, before he began his operations on him, and certainly the most ample time and opportunity to ferret out a fraud, if fraud there was.

But Diggs, in his bill of complaint, does not charge that the deeds were made to defraud subsequent creditors, but charges that the defendant was indebted *at the time* of making them, and relies upon the theory of *continuous* indebtedness to support his claim, and there is no proof of any other debt.

But we have before said that the theory of continuous indebtedness, as advanced by the complainant, is untenable.

Reasonable diligence is one of the conditions of obtaining relief at the hands of a Court of equity Of the soundness of this rule there can be no doubt. If parties who have good reason to assail the transfers of property, delay unreasonably in so doing, there is always danger that the rights of innocent third parties may be affected. Therefore equity demands that reasonable diligence that the nature of the case before it demands. I do not think that such reasonable diligence is shown when one merchant, dealing with another, and both residents of the same city, and both dealing in the same article, stands by for five years after a deed is put on record, before he complains of it, and who only complained of it when he did, because his customer had become insolvent.

I think the decree should be affirmed.

(Filed 9th January, 1889.)