# CIRCUIT COURT OF BALTI-MORE CITY

Filed May 12, 1891.

### YOUNG O. WILSON ET AL.
### VS.
### ROBERT E. DIFFENDERFER AND ANNIE E. DIFFENDERFER.

*Fielder C. Slingluff* for plaintiffs.

*Emmons & Emmons* and *Col. Charles Marshall* for defendants.

PHELPS, J.—

This is a creditor's bill to vacate conveyances of property on Park avenue from the defendant, indirectly, to his wife. The main pair of deeds was dated December 1, 1888, and the consideration of $13,000 expressed therein is impeached as false and pretended. A small lot in rear of the property thus conveyed was the subject of another pair of deeds, dated 3rd of December, 1889, and the consideration of $200 is impeached on like grounds. All four of these deeds are claimed to be in fraud of creditors.

The answer of Diffenderfer denies the indebtedness. The answers of both Diffenderfer and his wife deny that the deeds impeached were fraudulent, and claim that the considerations therefor are true and *bona fide*. The defence is that in 1876 Mrs. Diffenderfer purchased a lot on Edmonson avenue subsequently improved by two dwellings and a double stable. That these houses were afterwards sold, one in 1882 for $7,050, and the other in November, 1888 for $7,000, and that out of the proceeds of these sales the consideration for the Park avenue lots was paid.

Among the exhibits proved there is a note of Diffenderfer for $6,000, dated 5th of June, 1883, payable to the order of Annie E. Diffenderfer, his wife, endorsed by her to Howard H. Emmons, and by him endorsed "paid." Mrs. Diffenderfer swears that she received this note from her husband "for the $6,000 mortgage," which she obtained from Otto, one of the purchasers of the Edmondson avenue houses, and which mortgage she "loaned" to him. That this note was returned to her husband, through Mr. Emmons, the intermediary grantee, at the purchase of the Park avenue property, and as part of the $13,000 consideration therefor. The balance or that purchase money she accounts for by the exhibition of two paid checks, amounting together to $7,000, both dated 1st of December, 1888, one to the order of her husband, the other to the order of Emmons, and by him endorsed over to the same. The possession of this $7,000 in bank to her personal credit she accounts for by the exhibition of a certified and paid check for that amount, the original of which was withdrawn from the custody of the examiner by Wischmeyer, the maker, but a copy whereof, certified correct by the examiner, remains on file. Wischmeyer was the purchaser of the Edmondson avenue house, sold in 1888. His check is made to the order of Mrs. Annie E. Diffenderfer, 21st of November, 1888. This check she swears she deposited in the same bank on which the two checks above mentioned were drawn. In this way, the $7,000 received by her as the proceeds of the sale of the Edmondson avenue property in November, 1888, went to her husband in part payment of the Park avenue house bought of him a few days later, the remaining $6,000 to make up the full consideration of $13,000, being accounted for by the $6,000 note above mentioned, being part of the proceeds of the other house on Edmondson avenue.

There still remains the $200 consideration for the small lot. She exhibits a note for $1,200, dated 3rd of December, 1888, signed R. E. Diffenderfer, to the order of Annie E. Diffenderfer, upon which is endorsed a credit of $200, dated 3rd of December, 1889. "This

note," she testified (p. 55), "is for the $1,000 that Mr. Otto paid me to bind the bargain." 12th Q. "What did you do with the $1,000 Mr. Otto paid you?" I loaned it to Mr. Diffenderfer. 13th Q. "What did Mr. Diffenderfer give you for that $1,000?" He gave me a note promising to pay it. 14th Q. "What became of that note which he gave you?" He renewed it by giving me this one with the interest added in. Being asked to explain the endorsement on the note, she says "there was a small triangular lot in the rear of my house, No. 1729 Park avenue, which I purchased for $200, which was credited on the back of this note."

It will be observed that the effect of this testimony, if credited, is to show that the legal relation of debtor and creditor was formally established between the husband and wife as regards the sums of $1,000 ($1,200, with interest), and $6,000, and that as to $7,000, the money was absolutely hers when paid over. As to the two first named sums, the effort is to show that the money, in the first place, belonged to the wife as of her separate estate, and in the next place, that the husband received the money under an express promise or promises of repayment made at the time. Grover vs. Radcliff, 63 Md. 496. The difference between the case cited and this case is that in the former there was no evidence before the Court outside of the recitals in the deeds, and upon the legal effect of those recitals the question of prima facie validity exclusively depended.

If it be true that the legal relation of debtor and creditor existed between the husband and wife, the law "regards her rights with as much favor as those of other creditors. He may prefer her in a deed of trust for the benefit of creditors, or he may convey property to her absolutely in consideration and discharge of such debt, in the same way he could in reference to a debt due by him to any other party." Crane vs. Barkdoll, 59 Md. 535.

The vital importance of this testimony, and the interest of the witness, naturally called for a searching cross-examination. As to the $6,000 note, the fact was brought out that this was not an original note, but a renewal of four other notes, which had been previously given by Diffenderfer to his wife, from time to time, in exchange for certain notes belonging to her, being the notes of Otto for the deferred payments of one of the Edmondson avenue houses (40xQ). The four Otto notes she gave or "loaned" as she swears to her husband; the four notes her husband passed to her in lieu thereof, she kept until the $6,000 note was given in renewal of the four, and then she destroyed them.

Referring, at this point, to the testimony of the husband on the same subject, it will appear that there are minor discrepancies in detail, the effect of which is to be carefully considered. Upon being asked (18th Q.). "What was done with the proceeds of the house sold to Mr. Otto," he answers: "Mrs. Diffenderfer loaned me in 1882 the amount of the four mortgage notes —$6,000—given by Mr. Otto, for which I gave the note I now produce," exhibiting the $6,000 note in question, and explaining that this note was given to his wife "to return a like amount loaned by her in the mortgage notes of Otto." He says nothing about the $6,000 note being in renewal of four destroyed notes.

The purchase money of the Edmondson avenue house sold by Mrs. Diffenderfer to Otto in 1882, amounted as before stated, to $7,050. The first payment of $1,000 was made by note dated 30th of November, 1882, to the order of Lowe, and by him endorsed to R. E. Diffenderfer. Four notes, secured by mortgage, were all dated 21st of December, 1882, all to the order of Annie E. Diffenderfer, in the amounts and at the times following, viz:

1 note for $1,000 with interest at 60 days.

1 note for $2,000 with interest at 6 months.

1 note for $2,000 with interest at 12 months.

1 note for $1,000 with interest at 15 months.

The $6,000 note in question bears date June 5, 1885, after the maturity of the $1,000 note at 60 days, but before the maturity of either of the other notes. The date at which these notes were discounted do not appear. If that $6,000 note be genuine and not fabricated for the purpose of this suit, its date and delivery may be considered as practically contemporaneous with the loan or loans of the four mortgage notes. Is it a genuine, honest note?

The learned counsel for creditors was not understood as contending that this note was a fabrication, supported by perjury. His main reliance was upon another ground to be hereafter considered. It is sufficiently obvious that if husband and wife had entered into a conspiracy to cheat his creditors and impose upon the Court by fabricating evidence, it was about as easy to have manufactured four notes of the proper dates and amounts as one. And if such a conspiracy had existed, a story on its face consistent would in all probability have been concocted between them.

In this view, the discrepancy in detail between their statements does not discredit the testimony of either. Upon closely examining Diffenderfer's testimony, it will appear not really inconsistent with the wife's, although he says nothing about the destroyed notes. His attention was not called to that circumstance, although he was afterwards cross-examined on other points. The same observation applies to the other suspicious circumstance of destroying original notes. It would have been easier to fabricate and produce the supposed originals than to fabricate fictitious renewals and invent a story to account for them. The language of the Court in a somewhat similar case is applicable here. The destruction of notes and minor discrepancies in detail, while enough to arouse suspicion and invite careful scrutiny, are not sufficient to justify the Court in "imputing perjury to these witnesses by declaring their testimony to be substantially false, and that these notes were fabricated for the purpose of enabling the husband to cheat and defraud his creditors."

Crane vs. Barkdoll, 59 Md. 537, 8.

The same remarks apply also to the $1,200 note upon which is endorsed the credit of $200 as the consideration for the small lot. The main controversy in this case goes back to 1882, and impeaches the Edmondson avenue transaction of that year, as a fraud upon subsequent creditors. Plaintiffs in their bill claim to be creditors upon promissory notes to the aggregate of $875, being renewals of a running account existing since the beginning of the year 1886. The co-plaintiffs, Wood & Co., claim to be creditors upon notes to the amount of $2,075, the account running from December, 1884.

The deed from Gabriel D. Clark, Jr., executor of Emma Clark to Annie E. Diffenderfer bears date and was recorded 15th November, 1882. In consideration of $2,718.75 acknowledged to be paid, it conveys in fee a lot on Edmondson avenue, 36.3 by 150 feet. It recites that the sale was made under the order of the Orphans' Court ratified 15th of July, 1876. According to Diffenderfer's testimony, the consideration was paid as follows: In September, 1876, there was a payment of $250, together with three months' interest, $3.75, making $253.75. The receipt for this payment is exhibited. It bears date 13th of September, 1876, and is distinctly in the name of Mrs. Diffenderfer, the wife.

The next payment was made 12th October, 1882, $1,200, and the receipt for that is also in the wife's name. The balance was paid November, 1882, upon the delivery of the deed. The first payment of $250 he supposes was made by his wife out of her own "savings." The $1,200 payment was furnished by himself to the best of his knowledge, and the balance was handed him by his wife. She had a house of her own on Saratoga street which netted her $250 per annum, and which house her husband gave her in 1877.

The wife's account of these payments is somewhat vague and obscure. She is certain as to the $250 payment, but uncertain as to the rest.

The result so far as the consideration for the lot is concerned undobtedly is that practically the greater part of that consideration must be taken to have been furnished by the husband.

The improvements he made at his own expense in 1882, one of the houses, as before stated, was sold to Otto in November '82. The other the parties occupied as their dwelling until 1st of December, '88, when the sale already mentioned was effected to Wischmeyer. The proceeds of the two sales aggregated $14,050, and unquestionably nearly the whole of those proceeds represented money, time, labor and material, voluntarily settled by husband upon wife prior to and during the year 1882.

The transaction is not impeached, and never has been, by any creditors whose debts had then accrued. As regards that transaction, the plaintiffs

are subsequent creditors, their claims dating back, as has been stated, to January, 1886, and December, 1884.

"We respect to the law applicable to such a case, there is no difficulty. It is well settled in this State that a voluntary conveyance made by a party solvent at the time may be impeached and set aside by subsequent creditors, provided it is executed with the intention and design to defraud those who should thereafter become his creditors. But here as in other cases where fraud is charged, the fraudulent purpose will not be *presumed* but must be *proved*. The *onus* rests on the parties assailing the deed to establish the fraudulent intent by satisfactory proof."

Matthai vs. Heather, 57 Md. 484.
Williams vs. Banks, 11 Md. 198.
Moore vs. Blondheim, 19 Md. 172.

The rule recognized by the Supreme Court of the United States is expressed in a very recent case as follows:

"Even a voluntary conveyance from husband to wife is good as against subsequent creditors, unless it was made with the intent to defraud such subsequent creditors, or there was secrecy in the transaction by which knowledge of it was withheld from such creditors, who dealt with the grantor upon the faith of his owning the property transferred; or the transfer was made with a view of entering into some new and hazardous business, the risk of which the grantor intended should be cast upon the parties having dealings with him in the new business."

Schreyer vs. Scott, 134 U. S. 411.

In this particular transaction there was no secrecy. The deed was promptly recorded. The plaintiffs did not deal with the husband upon the faith of his owning the property. Nor was the settlement apparently made "with a view of entering in some new and hazardous business." It was but the completion of an inchoate transaction begun as early as 1876. The defendant entered upon no new business shortly thereafter, but used the $6,000, for which he gave his note to his wife, as capital in prosecuting his old business as a builder. It is true that he purchased ground, and built houses, and in all such operations there is more or less of hazard. It cannot fairly be claimed that he took more than the ordinary chances incident to all enterprises of the kind. It is certain that after 1882 he purchased a great deal of property, and that in his own name.

It is also true that in the defendant's statement of his losses, hereinafter referred to, there is an item of $4,000 lost in a hat business. The defendant in 1886 appears to have taken stock in a hat manufacturing company, in which he lost his money. That is all we know about it; that four years after the settlement on his wife he made this unfortunate investment. There is nothing whatever from which to infer that he had this outside enterprise in view in 1882. Some years later, in fact upon the eve of his assignment, we find him also taking stock in an electric company, part of which he had put in his wife's name. We also know nothing of this except from his own testimony. He says the stock cost him no money, "not a cent," it was issued partly to him, partly to his wife, at his instance, for his services in "promoting" the company. The stock had no value at the time and has had none since. It is plain that this incident reflects no light back upon the motive of the party seven years before, even if its effect was to abstract assets from his estate, which it was not.

Nor can it be fairly presumed, in view of the dates, that the transaction, begun in 1876 and consummated in 1882, was effected in contemplation of incurring indebtedness, beginning as to Wilson & Co., in 1885 (Bill, par. 3), and as to Wood & Co., in December, 1884 (Rec., p. 18).

As to the party's financial condition at the critical period, a great deal of testimony has been taken. He has exhibited statements showing his assets and liabilities in 1882, and the details of his losses since. Upon these he has been closely cross-examined. He claims that these statements show him to have been worth at that time, over $30,000, exclusive of the Edmondson avenue property, clear of all liabilities, and that by the depreciation in values, expenses incident to carrying the property in the expectation of better prices, loss in the hat business of $4,000, and bad debts amounting to $3,200, his losses since 1882 aggregate $40,000. He made an assignment in 1890 and from the property conveyed to his assignees, after paying expenses and liens, there was or will be realized to the unsecured creditors only an insignificant

dividend. One of the assignees was called by the plaintiffs, and testified on cross-examination, that the shrinkage in property since 1882 was as much as 25 per cent. He also expresses his opinion that "all this property would have realized considerably more if held over to some future day."·

Without going further into detail, the effect of all this testimony is not such as to establish satisfactorily the insolvency of the husband at the time in question, or that his financial condition was so precarious as to furnish reasonable ground for the presumption that he was then contemplating insolvency.

Taking in the whole situation, it may be summed up in language already used in two other cases:

"Reverses came unexpectedly while in the pursuit of his ordinary business, without any intention on his part to defraud his creditors, and it may be said that, without any fault on his part except a want of human foresight, he became embarrassed and insolvent. It is not apparent that Breese had in view at the time of the execution of the deed to his wife" (in lieu of these words, read. It is not apparent that Diffenderfer had in view at the time of the voluntary settlement upon his wife in 1882), "any such result, or that he in any way contributed to produce the result which followed, for the purpose of defrauding his creditors and enjoying the advantages to be derived from the provisions made for his wife. Under such circumstances, the presumption of any fraudulent intent is rebutted, and it is manifest that he had done no more than any business man has a right to do, to provide against future misfortune when he is abundantly able to do so."

Carr vs. Breese, 31 N. Y. 534, cited with approval in 134 U. S. 414.

It was argued in behalf of the plaintiffs that, admitting the genuineness of the $6,000 note, the very fact of the passing of such a note between husband and wife was a suspicious circumstance. It looked as if they were providing a shelter against a "rainy day," to use the expressive language of counsel.

Inasmuch as the public records at that time disclosed to all persons interested, the wife's ownership of the property, the passing of the note, which was entirely consistent with that record, could deceive or injure no one. And as to making provision against a "rainy day," it has already been shown that the proposition announced by the Court of Appeals of New York has been endorsed by the Supreme Court of the United States that a man in business has a "right to provide against future misfortune when abundantly able to do so."

81 N. Y. 588; 134 U. S. 414.

As to Diffenderfer's existing creditors in 1882, we hear of but one whose claim was not paid in due course of business.

He owed Rice $1,400 for bricks, and this debt was not settled until after the assignment. It was then secured by a mortgage given by Mrs. Diffenderfer upon her Saratoga street property. Rice was called as a witness for the plaintiffs, and was asked: "Why was not the debt paid?" "Well, I never pushed them for it; I generally renewed the notes whenever they came due." "Did you ever ask him for the money?" "I don't think I did." If Rice is to be taken as a representative of the class of creditors subsisting in 1882, it is quite clear that they saw no occasion for alarm in the voluntary settlement of that year, and did consider themselves defrauded by that transaction.

Returning now to the transfer of the Park avenue property in 1888-9, it has been seen that the consideration for this transfer, made by the husband to Emmons, and by Emmons to his wife, consisted of the proceeds of the sales of the two houses on Edmondson avenue belonging to his wife. It has further been shown that notwithstanding the husband's insolvency, the legal relation of debtor and creditor being established between the husband and wife, the former may validly convey property to the latter in discharge of such debt.

Crane vs. Barkdoll, 59 Md. 535.

The contention now is, that there is a distinction to be made between a case where the separate property of the wife originally belonged to her, either as her ante-nuptial property, or as acquired by her independently of her husband, and a case like the present, where the separate property of the wife was, with an inconsiderable

exception, a gift from him after the marriage. No case has been cited in support of any such distinction, but attention has been called to the fact that in all the cases which have recognized the relation of debtor and creditor between the married parties, it has so happened that the basis of that relation was the separate estate of the wife independently of her husband's bounty.

Without stopping to inquire into the correctness of this statement, and taking it for granted that an exhaustive search would establish its literal accuracy, it is difficult to perceive upon what principle the supposed distinction is founded. Where the two transactions are in form and in substance distinct and independent, where the voluntary settlement upon the wife is an honest and valid gift, and the subsequent transfer of other property from the husband to her is upon consideration of the avails of that settlement, there seems to be no reason, either of justice or policy, why the latter transfer should for that reason only, be condemned as fraudulent.

But where the two transactions, although in form separate, are in reality parcels of one scheme of fraud, and the effort is to prove that they are so connected, the fact that the funds used to consummate the final transfer came originally from the husband's assets, would unquestionably be available as one of the connecting links.

We have a very instructive case in Maryland, with which this case may be compared or contrasted, in which a conveyance made indirectly from a party afterwards insolvent, to his wife, was successfully impeached by his subsequent creditors. Diggs vs. McCullough, 69 Md. 592. The Court there found, both in the circumstances of that conveyance itself, and in the later dealings of the party, abundant *indicia* to justify the Court in saying that the conveyance impeached was the "first step in a systematic scheme to defraud."

69 Md. 601.

It is true that in that case it was claimed in support of the conveyance that the consideration was furnished by the wife's earnings as a dressmaker, but the effort to establish the legal relation of debtor and creditor upon the basis of those earnings, signally failed. There was in that case a secreting of assets, incredible testimony to account for their disappearance, and a series of justly suspected transfers to relations other than the wife, all of which together, constrained the Court to declare that the case was one of "rank fraud," a plan deliberately formed to cheat creditors, and minutely carried into execution.

69 Md. 608.

After a careful review of the testimony, this Court finds itself unable to take the responsibility of applying such strong language or anything approaching it, to the voluntary settlement of 1882, in connection with the subsequent transfers of 1888 and 1889, even in view of the circumstance that the results of the former became the basis of the latter.

Taking a general view of the whole connected transaction, the question for the creditors to answer is: What assets of this debtor have been abstracted from your reach, upon which you had a right to rely? If the settlement of 1882 was an honest and valid arrangement its effect was to vest in the wife an unimpeachable title to two lots on Edmondson avenue, worth $14,050. She has in effect exchanged that property for two lots on Park avenue worth $13,200, and for the difference she holds a note. If the creditors could not have taken in execution the Edmondson avenue property, why should they have access to its equivalent and representative?

Inadequacy of consideration in the transfer of the Park avenue property, is neither charged nor proved; $13,200 must be taken to be the fair value of these two lots.

It has been seen that the conveyances of the Park avenue lots were both made indirectly, through the intervention of a persona interposita. This indirect form of transfer is still much in vogue among conveyancers in this city to pass title from husband to wife, notwithstanding the legal sufficiency under the Code of the direct form. (Trader vs. Lowe, 45 Md. 13). It was not relied on in argument as a badge of fraud, and it has been held not to have that effect.

Medsker vs. Bombrake, 108 U. S. 73.

A great deal of testimony has been directed to the issue raised upon the

validity of the plaintiff's claims, and their proper standing as creditors. For all the purposes of this decision, the claims have been assumed to be established. Inquiry into their validity is thus rendered unnecessary.

*A decree will be passed dismissing the bill.*