## THE FARMERS AND MERCHANTS' NATIONAL BANK OF BALTIMORE *vs.* REBECCA A. JENKINS.

*Husband and Wife—Debtor and Creditor—Agreement— Wife's Separate Estate—Rights of Creditors of Husband.*

A husband sold shares of stock belonging to his wife at the time of their marriage, and used the proceeds in his business; he also received moneys from her guardian, which under the then existing laws of this State belonged to him absolutely, by virtue of his marital rights. HELD:

That if he appropriated the moneys thus received to his own use, even under a promise to repay her, or to invest it for her use, such a promise was without consideration, and could not, therefore, be enforced against him.

While the relation of debtor and creditor may doubtless exist between husband and wife, growing out of the receipt by the husband of the wife's separate estate, under a promise made at the time to repay her or to invest the same for her use, a general understanding that the money thus received by him belonged to his wife, and that he considered himself accountable to her for the same, is not sufficient for this purpose.

To support the claim of the wife for money so received, as against the rights of *bona fide* creditors of the husband, it must appear that it was received by the husband under an agreement to repay it to her, or to invest it for her use.

APPEAL from the Circuit Court of Baltimore City.

This appeal is taken by a creditor of the firm of T. Robert Jenkins & Sons, from a *pro forma* decree of the Court below, (PHELPS, J.) ratifying an auditor's count allowing the wife of T. Robert Jenkins, as an individual creditor of her husband, a large sum of money out of the individual estate of the latter. The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, RITCHIE, and BRYAN, J.

*Charles Marshall,* for the appellant.

*John Prentiss Poe,* for the appellee.

ROBINSON, J., delivered the opinion of the Court.

On the 18th of April, 1884, the firm of T. Robert Jenkins & Sons made an assignment of their individual and partnership property for the benefit of creditors. The entire property of the firm belonged to T. Robert Jenkins, the father, the sons having no other interest than a share of the profits.

This suit grows out of a claim of $51,882.64, filed with the assignee, by the wife of T. Robert Jenkins, for money and property which belonged to her, and which was appropriated by her husband, under a promise to repay her, or to invest the same for her use.

In some respects at least, this is an extraordinary claim. Mr. and Mrs. Jenkins were married in 1845, and the first items in the account begin with the first year of their marriage, now more than *forty years ago.* The interest alone exceeds $26,000, and the rest of the account is made up of $7,565.33 principal, and $18,223.81 rents and income received during all these years by Mr. Jenkins from property belonging to his wife.

The Farmers & Merchants' Nat. Bank of Balto. *vs.* Jenkins.

This large claim was made out for *the first time* in 1884, *after the failure of the husband,* and made out too, not from original entries, nor from any account kept by him, but by the book-keeper of the firm, under the special directions of Mr. Jenkins himself. The first knowledge the creditors had of the claim was when it was filed with the assignee, four months after the deed of assignment. Before the execution of this deed, Mr. Jenkins made a full statement of his affairs to his creditors, showing his assets and liabilities, with every reason to make the latter appear as large as possible, in order to induce the creditors to accept a compromise which he offered to make, and which they regarded as too small; and yet in the statement thus submitted by him, no mention whatever is made of this large indebtedness to his wife—an indebtedness more than sufficient *to sweep away* his entire individual property. And more than this, in a conversation about the same time with Mr. Sloan, from whom he borrowed $20,000, in regard to the condition of his affairs—his property and liabilities—not one word is said about the claim now in controversy.

It is a claim unsupported by a single line of writing, and rests solely upon the testimony of Mr. Jenkins and his wife. It is hardly necessary to say in considering a claim made under these circumstances, Courts cannot scrutinize too closely the evidence on which it is founded, Now what is the proof? Mrs. Jenkins had at the time of her marriage in 1845, Cathedral stock of the value of $2,883.00, and this stock was sold by her husband, and the proceeds were used by him in his business. Besides this, he also collected and received from her guardian $14,000, of which $9,288.00 was invested in the purchase of a dwelling house, No. 75 Centre street. This house was conveyed to his wife, and the balance of the $14,000, namely, $4,712.00, was appropriated to his own use.

There can be no doubt that when Mr. Jenkins sold the Cathedral stock, and when he collected the $14,000 from his wife's guardian, the money thus received by him was, under the then existing laws of this State, absolutely his own property. *Turton vs. Turton*, 6 *Md.*, 375; *Logan vs. McGill and Wife*, 8 *Md.*, 462; *Anderson vs. Tydings*, 8 *Md.*, 427; *Schindel vs. Schindel*, 12 *Md.*, 311; *Bayne and Wife vs. State, use of Edelen*, 62 *Md.*, 100.

The money thus received by him constituted no part of his wife's separate estate, but belonged to him by virtue of his marital rights. He could if he saw proper settle the whole of it or part of it on his wife. But if he appropriated it to his own use, even under a promise to repay her, or to invest it for her use, such a promise was without consideration, and could not therefore be enforced against him. It was a *mere promise to give,* and not a contract, to constitute which there must be not only a promise, but a consideration to support it. As was said in *Bayne's Case,* such promises amounted to nothing more than mere voluntary agreements to make future donations "to the wife, by the return of like sums of money. Being without consideration they could not be enforced, for a mere promise to make a voluntary gift is not sufficient."

This then disposes of the claim for the Cathedral stock and interest thereon for nearly forty years, and also of the claim for $4,712.00, the balance of the $14,000 collected from the guardian of Mrs. Jenkins. But $9,288.00 of this $14,000, was, as we have said, invested in the Centre street house, and this house was conveyed to Mrs. Jenkins. Whether under the deed it belongs to her as her *separate estate,* is a question we shall not stop to consider. For the purposes of this case we shall treat it as her *separate property.* Now the relation of debtor and creditor may, no doubt, exist between husband and wife, growing out of the receipt by the husband of the wife's separate estate, under a promise made at the time to repay her or to in-

vest the same for her use. *Bowie vs. Stonestreet, et al.,* 6 *Md.*, 418; *Kuhn, Gar. vs. Stansfield,* 28 *Md.*, 210; *Hill vs. Hill,* 38 *Md.*, 183.

In this case, the Centre street house was occupied by Mr. Jenkins and his family from 1850, the time when it was bought, until his removal to Mount Vernon Place in 1867. There is no pretence that he ever agreed to pay to his wife rent during the time it was thus occupied. Instead of rent, however, she claims interest on the purchase money of the house during all these years. Precisely on what grounds the claim for interest is to be supported, we do not understand. There is not a particle of proof to show that Mr. Jenkins ever agreed to pay such interest. The house was bought for a home, and it was occupied as a home, with the knowledge and acquiescence of Mrs. Jenkins. The purchase money, although it came through the wife, belonged to Mr. Jenkins under the then existing laws of this State. If he thought proper for this reason to make a settlement on his wife, the mere occupation of the house by himself and his family, would not in itself be a ground on which his wife could claim interest on the purchase money. There must be proof of a promise or agreement of some kind on the part of Mr. Jenkins—a promise or agreement made at the time.

We come now to the claim for the rent of the Centre street house, received by Mr. Jenkins from 1867, the time he left it until 1884, when the deed of assignment was made; and also to the claim of the income from the property acquired by Mrs. Jenkins in 1876 under the will of her aunt, Mrs. Hillen. The burden of proof is upon Mrs. Jenkins to show that this income from her separate estate was received by her husband under an agreement to repay her, or to invest it for her use. And this we think the evidence fails to establish. A great deal is said in the testimony of both Mr. and Mrs. Jenkins about a general understanding that the property belonged to Mrs.

Jenkins, and that he, Mr. Jenkins, always considered himself accountable to her for the income thus received by him. But when the direct question is asked, as *to the terms of the agreement, and when and where it was made,* the answer is always evasive and unsatisfactory.

Now as to Mr. Jenkins' testimony :

22 *Question.* " When you received into your possession the several items of your wife's property as stated in the account now shown you, what agreement or understanding was there as between you and your wife as to the repayment to her of all said sums?" How was the matter understood between you ?

*Answer.* " The understanding was, that it was her property."

23 *Question.* " What was the understanding in regard to the repayment to her ? Was it to be treated as money belonging to you, or money in your hands for which you were to be accountable to her ? "

*Answer.* " The understanding was, that it was money in my hands, for which I was to be accountable."

24 *Question.* " What consent did Mrs. Jenkins give to you that you should take the moneys into your possession as your own ? "

*Answer.* " She did not consent that I should take them as my own."

26 *Question.* " Why did you not repay her those sums of money or invest them for her benefit ? "

*Answer.* " Because I always considered that I had sufficient property to reimburse her, at any time she might demand it."

This is testimony offered in chief to prove an express agreement on the part of Mr. Jenkins to invest the money for the use of his wife, and one cannot fail to observe how general are both the questions and the answers.

Now upon cross-examination of the witness.

33 *X-Question.* " Did you ever at any time prior to the statement of this account, render to Mrs. Jenkins an

account, showing the amount of your indebtedness, principal or interest, or both, to her, or did she ever request any such account from you?"

*Answer.* "No, I did not, and she never requested it."

49 *X-Question.* "Mrs. Jenkins was perfectly aware, was she not, of her ownership of this stock, and she also knew you were collecting the dividends?"

*Answer.* "Yes, sir."

50 *X-Question.* "Was there any agreement between Mrs. Jenkins and yourself, as to what you should do with the interest when collected; if so, when was that agreement entered into, and what were the particulars of it?"

*Answer.* There was no agreement entered into."

92 *X-Question.* "Was there any agreement between you and Mrs. Jenkins, with reference to the rent collected by you for No. 75 Centre street; and as to the repayment of it to her; if so, state what that agreement was, and when it was made?"

Here was a direct question.

*Answer.* "She expected to receive the rent of No. 75 Centre street, and spoke of it from time to time. I can't give any date."

93 *X-Question.* "Is that your whole answer to the question?"

*Answer.* " Yes, sir."

So, instead of the proof of an *express promise* on the part of Mr. Jenkins, to repay or to invest the rents for the use of his wife, we have the evidence, that she expected to receive the rents, but not one word about a promise or agreement on his part.

And the testimony of Mrs. Jenkins is equally unsatisfactory.

26 *X-Question.* " But what did he tell you on these different occasions within the last four or five years, or prior thereto, when you requested him to invest these rents? He must have said something when you made this request."

*Answer.* " Well, I can't say exactly what I said during those conversations ; it was always understood that it was my money, and I did not interfere with him in the renting of the house, but, as I said again, I asked him for them. Mr. Jenkins was very reticent about his business matters ; and very little business matters were talked at home anyhow ; but, as I said before, I felt perfectly secure."

27 *X-Question.* " Then I understand, on these various occasions, when you spoke to Mr. Jenkins about investing the rent of this house, No. 75 Centre street, he made no especial or definite answer."

*Answer.* " No, he generally attended to my business in that way—I depended on him entirely."

And when asked whether she ever requested her husband to pay her the ground rents and income on the city stock, property acquired under the will of her aunt, she says, " I did not—he gave me money for the house sufficiently, and I had no occasion to ask for them."

During all these years of their married life, the money thus received by Mr. Jenkins from his wife's property, was deposited by him to his own credit, or used in his business. He kept no account, nor is there any entry of any kind to be found from which the relation of debtor and creditor can be inferred. He was a man of large means, a leading and successful merchant, in the possession of property amounting to more than two hundred thousand dollars. She was content, as she says, to let her husband have and use the income from her property as he pleased. Both of them felt assured, that, under any circumstances, there would be property enough to enable the wife to live, as she says, wherever she pleased. And it was not until after the failure of Mr. Jenkins, that this claim for over fifty thousand dollars was made out—a claim embracing charges for money received by him nearly forty years ago. And whatever may have been the general understanding, that the money thus received by him belonged to his wife, and for which

he ought to be accountable, the proof fails to show that it was received by him under an agreement to repay it to her, or to invest it for her use.

For these reasons the *pro forma* decree will be reversed.

*Decree reversed, and*
*cause remanded.*

(Decided 11th March, 1886.)