**H. A. LEVANNE COMPANY, Inc.**

v.

**Bernard KATZ, Helen G. Katz, Kamet Construction Company, Inc., a Maryland corporation, and Sunnyside Development Company, Inc., a Maryland corporation.**

Civ. No. 8164.

United States District Court
D. Maryland.

Nov. 5, 1957.

Nyburg, Goldman & Walter, Lawrence I. Weisman, Baltimore, Md., Sher, Oppenheimer & Harris, Abraham J. Harris Washington, D. C., for plaintiff.

Goodman, Meagher & Enoch, Philip H. Goodman, Baltimore, Md., for defendant Bernard Katz.

Benjamin B. Brown, Washington, D. C., for Bernard and Helen G. Katz.

David I. Abse, Washington, D. C., for Kamet Construction Co. and Sunnyside Development Co.

R. DORSEY WATKINS, District Judge.

These are supplementary proceedings purportedly in accordance with the provisions of Maryland Code of Public General Laws (1951 Edition) Article 75, Sections 148–153, Article 45, Section 1, Article 31A and Article 39B, and Title 28 U.S.C.A. §§ 2201 and 2202, brought by H. A. Levanne Company Inc. (Levanne), in aid of a judgment in the amount of $14,500 and costs entered by stipulation in this court on April 19, 1956, against Bernard [W.] Katz (Bernard) in a suit filed against him on April 11, 1955. For an understanding of the questions involved a brief review of the background of said suit is necessary.

For some time prior to 1954, Bernard had been engaged in the construction of residential properties, with at the best indifferent success, except perhaps in the very last part of that period. One of these undertakings was pursuant to agreement dated June 18, 1952, between

Levanne and Deland Construction Corp. (Deland), Bernard being president, a director and a large, if not the controlling, stockholder of Deland. The project, a "joint venture" of Levanne and Deland, involved the construction of 146 one-family dwellings in Laurel, Maryland. The net profits were to be divided 45% to Levanne and 55% to Deland. Bernard was to receive a salary of $300 a week, and actual travel and living-on-the-job expenses, not to exceed $100 a week. Deland was to devote itself exclusively to this project, and Bernard was not to engage in any other enterprise until completion of the project. Harold A. Levanne and Bernard personally guaranteed the corporate obligations under the construction agreements entered into by the corporation.

The undertaking was not successful, and on or about March 19, 1954, an agreement was negotiated between sub-contractors and materialmen on the job on the one hand, and Levanne, Deland, Bernard and Harold A. Levanne on the other. The agreement provided for the payment of $15,000 in twelve monthly payments of $1250, less credit for certain equipment, by Levanne and Deland, and for the release of the personal guaranties. Bernard advised Levanne that Deland was without funds and would not be able to contribute to any of the required payments. "In order to induce" Levanne to enter into such agreement and "to make the monthly payments required thereunder * * * and to pay the further sums yet to be expended on behalf of the joint venture", Bernard by agreement dated March 19, 1954, personally undertook (among other undertakings not here material) to pay Levanne $1,500 within three months; and commencing six months from date and monthly thereafter to pay Levanne each month $500, until the amount so received by Levanne should equal 55% of the sum of the excess of payments by and credits due Levanne, plus amounts to be expended and amounts paid on account of the $15,000

obligation to subcontractors and materialmen (less credit for sale of equipment). The agreement further provided that default by Bernard "in the making of any of the aforesaid payments shall accelerate the due date of the entire unpaid balance."

On April 11, 1955, Levanne sued Bernard on this agreement, alleging that Bernard had "fulfilled none of the promises made by him therein" and that there was due by Bernard thereunder the sum of $19,701.54, for which judgment was prayed. Bernard answered denying that the provisions of the agreement had not been met or that he owed anything and averring that on the contrary he had overpaid; and admitted the remaining allegations of the complaint. In response to interrogatories directed to the claim of overpayment, Bernard stated that he had "no accurate record", "no record" and "did not keep records"[1] as to unpaid salaries, expenses or time devoted to the joint venture, but that it had been "his judgment" when his answer was filed that Levanne owed him $139.35, but since that time Bernard had become entitled to an additional credit of $2,750 on the sale of equipment.

Shortly after a change of counsel by Bernard, the case came on for trial on April 18, 1956, and after one day of trial counsel stipulated for entry of judgment in favor of Levanne against Bernard "in the amount of $14,500.00 with court costs each party waiving all rights of appeal." Such judgment was entered on April 19, 1956.

On June 15, 1956, on verified petitions, orders were issued for the appearance of designated persons for examination before a United States Commissioner in supplementary proceedings. Attachments were issued on July 12, 1956.

On motion based upon examinations in such supplementary proceeding, Helen G. Katz (Helen), wife of Bernard, Kamet Construction Company, Inc. (Kamet) and Sunnyside Development Company,

---

1. Language significantly anticipatory of the testimony of defendants in the current proceedings.

Inc. (Sunnyside) were made additional parties defendant on August 30, 1956. Helen owned one-half the stock of Kamet and Sunnyside, and Bernard was president and a director of each.

In the course of examinations taken before the United States Commissioner, and in the trial in this court, it was developed that during 1954 and 1955 Bernard received nearly $40,000 in salaries and bonuses from Kamet and Sunnyside; that a very substantial part of this was paid over to Helen or into her personal account, and the balance was put into the joint account of Bernard and Helen, or used for family purposes, such as mortgage and insurance payments, or for living expense.

Plaintiff claims that the transfers from Bernard to Helen are invalid; if not fraudulent, they were acquisitions "of property passing from one spouse to the other * * * in prejudice of the rights of subsisting creditors" contrary to the provisions of Maryland Code of Public General Laws, Article 45, Sec. 1;[2] or if with the intent to defraud plaintiff, a violation of the Uniform Fraudulent Conveyance Act, Maryland Code of Public General Laws, Article 39B, Secs. 4, 5, 6 and 7.[3]

The ultimate contention of Bernard and Helen is that since their marriage in 1946, Helen had lent Bernard various sums, finally claimed to aggregate approximately $20,000, and that the transfers to Helen to the extent of $10,000 were repayments of said loans (leaving a balance of $10,000 unpaid), the remainder being for living expenses.

The evidence also developed the receipt by Helen in 1955 of approximately $12,663, being the proceeds of the sale of a house and furniture in Long Beach, New York, title to which had been taken in the name of "Bernard W. Katz and Helen G. Katz, his wife." Bernard and Helen do not contend that Bernard's interest in the proceeds, received by Helen, was in repayment of loans,[4] but insist

---

2. "The property, real and personal, belonging to a woman at the time of her marriage, and all the property which she may acquire or receive after her marriage, by purchase, gift, grant, devise, bequest, descent, in the course of distribution, by her own skill, labor or personal exertions, or in any other manner, shall be protected from the debts of the husband, and not in any way be liable for the payment thereof; provided, that no acquisition of property passing from one spouse to the other, shall be valid if the same has been made or granted in prejudice of the rights of subsisting creditors, who, however, must assert their claims within three years after the acquisition of the property, or be absolutely barred, and, for the purpose of asserting their rights under this section, claims of creditors not yet due and matured shall be considered as due and matured."

3. "4. (Conveyance by Insolvent.) Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

"5. (Conveyance by Persons in Business.) Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

"6. (Conveyance by a Person about to Incur Debts.) Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

"7. (Conveyance Made With Intent to Defraud.) Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

4. Either of any part of the $20,000 mentioned, or in connection with the acquisition of the Long Beach property, infra.

that it was intended to be applied to the purchase of property at 7405 Pinehurst Parkway, Chevy Chase, Maryland.

There is also the fact that substantial sums transferred from Bernard to Helen, allegedly by way of payment on account of indebtedness, were immediately, at Bernard's direction, lent to Kamet or Sunnyside.

Substantial questions of the law relating to transactions between husband and wife are accordingly presented, and as Bernard and Helen were domiciled in New York from their marriage in 1946 until their removal to Maryland in 1953, it is necessary to consider the law of what state is applicable.

### The Alleged Loan and Repayment Transactions between Bernard and Helen.

For determination are the questions: Were there loans from Helen to Bernard, and if so, in what amounts? Were there repayments by Bernard, and if so, in what amounts?

Bernard and Helen contend that as at the times of the alleged loans they were domiciled in New York, the law of that State controls in determining the nature of the transactions between husband and wife. Levanne contends that the question is essentially one of the presumptions and inferences to be drawn from the evidence, and that the law of the forum prevails, citing A.L.I. Restatement of Conflicts, Secs. 595, 597, and Feist v. Druckerman, 2 Cir., 1934, 70 F.2d 333, 334; or that in the alternative, the substantive issue is whether or not the alleged loans and repayment thereof "con-stitute a defense to a tort action in Maryland" which "is governed by the law of Maryland, the place of the wrong." A. L.I. Restatement of Conflicts, Secs. 377–390.

Both sides agree that transactions between husband and wife are to be carefully scrutinized. The law of Maryland seems quite clear that a transfer from wife to husband is presumed to be a gift (Grover & Baker Sewing Mach. Co. v. Radcliff, 1885, 63 Md. 496, 500–501; Farmers' & Merchants' Nat. Bank v. Jenkins, 1886, 65 Md. 245, 3 A. 302; Bayne v. State, 1884, 62 Md. 100; Reed v. Reed, 1909, 109 Md. 690, 72 A. 414; 37 C.J.S. Fraudulent Conveyances § 177, p. 994, 24 Am.Jur. Fraudulent Conveyances, Secs. 104, 105). Of course, an actual debtor-creditor relationship may be created, but this requires more than a general assurance that the wife will be provided for in the future (Farmers' & Merchants' Nat. Bank v. Jenkins, supra) or the wife's general expectation or understanding that she will be repaid (Farmers' & Merchants' Nat. Bank v. Jenkins, supra; Levi v. Rothschild, 1888, 69 Md. 348, 14 A. 535); and it is questionable if an oral agreement to repay will suffice (Brooks v. Dent, 1850, 1 Md.Ch. 523 [Reprint 413]; Hill v. Hill, 1873, 38 Md. 183; Edelen v. Edelen, 1857, 11 Md. 415; Plummer v. Jarman, 1876, 44 Md. 632; Bowie v. Stonestreet, 1854, 6 Md. 418; Kuhn v. Stansfield, 1868, 28 Md. 210; Reed v. Reed, 1909, 109 Md. 690, 72 A. 414).

The New York law seems [5] to be that whether moneys received by a hus-

---

5. Briggs v. Mitchell, 1864, 60 Barb., N.Y., 288, 317, points out the significance of the lapse of a long period of time without any written receipt or memorandum, and no discussion of interest or principal until bona fide creditors were about to step in.

It might also be noted that the author of the article on Husband and Wife, 26 Am.Jur. Sec. 97, apparently does not find New York committed either to the theory that a transfer by wife to husband gives rise to the presumption that it it is a gift, or that it is a loan.

The court has not overlooked the contention of defendants that in New York "the law never presumes a gift", citing In re Kugel's Estate, Sur.1948, 192 Misc. 61, 78 N.Y.S.2d 851, 853; Matter of Bolin, 1892, 136 N.Y. 177, 32 N.E. 626 (must be an intent to give); Nay v. Curley, 1889, 113 N.Y. 575, 21 N.E. 698; and the foundation case of Grey v. Grey, 1872, 47 N.Y. 552, 555, quoting the maxim, "Nemo donare *facile* presumitur." (Emphasis supplied).

band from his wife are gifts or loans is "a question of intention upon the proof." Willis v. Willis, 1903, 79 App.Div. 9, 79 N.Y.S. 1028, 1029.

Since the alleged loan transactions between husband and wife occurred while they were bona fide residents of New York, it would seem clear that the consequences of such transactions would be determined by the laws of that State. Mackubin v. Curtiss-Wright Corp., 1947, 190 Md. 52, 57 A.2d 318, 321. However, in the view this court takes of the evidence it becomes immaterial which law is applicable.

When Bernard's deposition was begun on July 12, 1956, he volunteered the following statement[6] as to financial transactions with his wife:

"Q. Your wife has her own bank accounts, her own source of income? A. She has always had her own bank account. She is a girl of a wealthy family. Now, go ahead.

"Q. And from the money that goes into your joint account—some of the money that goes into your joint account can go from your wife's account, is that correct? A. Often, yes. It has always been that way.

"Q. I want to get that clear. A. She has loaned me a lot of money throughout the years.

"Q. She has lent you money? A. *Gives me money to work with, let's put it that way. Most times she has got it back, sometimes she hasn't.*

"Q. Do you give her notes when she lends you money? A. No, it is a family basis.

"Q. Who pays the regular household bills? A. Usually she does.

"Q. You mean she writes the checks? A. Yes.

"Q. But on which account, out of whose account are these paid? A. Mainly from my joint account and

occasionally you will find a smattering from her own personal accounts." (Emphasis supplied.)

After lunch, he was asked " * * * is there anyone who owes you any sum of money at this time except Mr. Weinberg?" and the answer was a flat negative.

Shortly afterwards, the deposition transcript shows the following:

"Q. What liabilities do you have now, except for this judgment [in this case]? A. Individually? I would say just ordinary every day living expenses.

"Q. The ordinary current bills? A. Yes."

Bernard's deposition was resumed on July 23, 1956. He testified during the morning session. After lunch, and after another witness had testified, he was recalled. He testified that the bulk of the bonus money he received from Kamet and Sunnyside, he "gave" to his wife. The United States Commissioner then commented:

" * * * Mr. Katz testified he just endorsed the bonus check to his wife. That is very important. If a check is received by Mr. Katz as bonus or salary and is endorsed by Mr. Katz to Mrs. Katz and she immediately loaned that to the corporation, here a deduction could be made it was a loan made by Mr. Katz and subject to attachment."

Counsel for Helen and Bernard then interjected:

"Except we have other evidence when Mrs. Katz takes the stand, we will prove differently. What he gave Mrs. Katz was not what he gave her but what he owed her and what he owed her good."

It was shortly after this that Bernard was asked if he owed his wife any money in 1955, and he replied that he had

---

6. The language of Helen and Bernard, called by plaintiff and defendants, is so significant that the court is reluctantly required to quote in extenso, in part that

others may gain the true savor, and in part to avoid the risk that any paraphrase would initially appear incredible.

always owed his wife money. Then followed:

"Q. How much did you owe her in 1955? A. Well, let's put it this way, from the time that we have been married, *my wife has been lending or giving or however you want to put it, money to go into various building ventures and do other things and to date I doubt if I have given her as much as she has given me over the years, or I have lost of her's, over the years.*

"Q. I am sorry, I didn't hear the last part of your answer. A. *I doubt if I have repaid or given her as much as I have spent or lost of her's, going into business.*

"Q. Did you and your wife have notes when money was exchanged? A. Notes? No. We never issued notes to each other.

"Q. What she gave you was a gift for you to go into business, wasn't it? A. *Well, there are all kinds of ways of calling it. I don't know if you would call it a gift. Sometimes it is given easily and sometimes it is given hard. She didn't like to give it up. Let's put it that way, and she hoped to get it back.*

"Mr. Brown: That's the question, did your wife look to you to repay her?

"The Witness: Yes, she always hoped she would be repaid.

"Q. Did you keep a record of these loans from her to you? A. I guess as you go along, mentally you keep a record, *so say I have hit her up for $10,000–$12,000, and some day I hope to give it back,* but to write it down and so forth, no.

"Q. How much did you hit her up as of March 19, 1954? A. As of March 19, through the years we have been married? I would say if we set $20–$25,000, I wouldn't be surprised, $20,000 maybe, not exactly. I would say it was somewhere around there.

"Q. How much have you repaid of that $20,000? A. Whenever I got my hands on any additional money I gave it to my wife. She is my wife. She has been good to me. I just want to reimburse her and be as good to her as I can." (Emphasis supplied.)

When asked in court to explain the two statements in the July 12, 1956, examination, in the light of his statements on July 23, 1956 and in court, the following occurred:

"Q. You did not regard this indebtedness to your wife as a liability? A. *I don't believe I would ever put it on a financial statement as a liability.* But surely, it is a liability." (Emphasis supplied.)

Helen, following Bernard as a deponent on July 23, 1956, testified as follows regarding transactions with her husband:

"Q. Mrs. Katz, have you ever made any loans to your husband? A. Yes, I frequently lend my husband money.

"Q. Pardon me? Would you speak up, please. A. Yes, I frequently lend my husband money.

"Q. You lend corporations of which he is an officer money? A. Yes.

"Q. How much money have you lent your husband? A. I would say over the period of our marriage, my husband is indebted to me for the sum of $10,000.

"Q. $10,000? A. Somewhere thereabouts.

"Q. That has not been—that he has not paid off? A. That's right.

"Q. And how many of these loans were made or how much in dollars of these loans was made within the past 3 years? A. I really have no way of remembering that at this moment.

"Q. Have you made loans from time to time and they have been repaid from time to time? A. Yes, some of them have.

"Q. Have you kept any record of these loans? A. No.

"Q. You have no record of these loans? A. I have record of business loans. I don't keep records of personal loans.

"Q. You mean, loans to corporations? A. Some.

"Q. Like to Kamet Construction Company? A. Yes.

"Q. And to Sunnyside. You have records of those loans? A. Yes.

"Q. With respect to loans you have made to those corporations, do you have notes? A. I imagine that I do. The lawyer has generally handled these things for me.

"Q. And you think you do have notes from the corporations? A. Yes.

"Q. But you have never taken notes from your husband? A. No.

"Q. Or kept any record? A. I think not."

\*   \*   \*   \*   \*   \*

"Q. Mrs. Katz, coming back to these loans that you say to your husband over the years, you said something about $10,000. Is that the total amount you lent to him or is that what you figured is the total amount unpaid? A. I would imagine that's the total amount unpaid.

"Q. He has paid you back from time to time? A. Yes.

"Q. How has he paid you back from time to time? A. *We have a very casual sort of money arrangement. He just gives me money.*

"Q. What does he do, give you $1,000 and then say, this is toward my account? What goes on when he just gives you money?

"Mr. Brown: Now look, there I step in. There comes confidential communication. I think that is far enough."

The testimony of the defendants Bernard and Helen was equally unsatisfac-tory in court on the question of the nature of the transactions between them, and the amounts of the alleged loans and repayments.

Loans.

Helen testified [7] that she had lent her husband, all during the marriage; that there was no written evidence; no notes or written agreements; the arrangements were "very casual". She claimed that she could identify the loans by withdrawals entered in her bank books. She also said that the loans to her husband came from her father, and so she could recall them back to 1946, but she could not recall transactions with Kamet and Sunnyside within the past three years. She expected her husband would pay back what was lent him; but she did not testify as to any direct agreement to that effect. In summary, she said her recollection was of $20,000 loans; that she was sure as to $18,945, and not sure as to $2,400. When asked as to her husband's deposition as to the transactions being "lending or giving or however you want to put it", and that "sometimes it is given easily and sometimes it is given hard", she said she construed this as her husband meaning to say she would not press him for repayment.

As to specific transactions, she testified, by reference to her bank books, that the first loan to Bernard was on March 18, 1946, in the amount of $4,500, out of $5,000 that her father had given her about that time. She was also positive as to a $3,000 loan on July 5, 1946. As to a number of other withdrawals in 1946, ranging from $1,000 to $400, she could say only that they "may have been a loan or a gift."

Her statement with respect to an alleged loan to Bernard on July 26, 1946, was that it represented the proceeds of a check of the same amount from her father to Helen and Bernard Katz; that the check was intended for her, but to save Bernard embarrassment, it was drawn in their joint names; that it was lent by her to Bernard, and was used to

7. February 11–13, 1957.

match a similar amount from her private account, the sum of $4,000 being paid on account of the purchase of property at Long Beach, New York, title to which was taken in the name of Bernard and Helen.

(Though somewhat out of place, Bernard's statements with respect to this purchase should here be considered. In his deposition of July 12, 1956, he said that he and his wife jointly put up $2,000, together with $2,000 his father-in-law gave his wife as a present ((no reference to a loan to him)); instalments on the mortgage were paid out of his earnings and her pocket, and his wife and he paid for the furniture. In court on February 3, 1957, he testified as to a loan to him from Helen of the proceeds of a $2,000 check her father had given her.)

Helen did not attempt specifically to identify any other loans to Bernard.

Bernard, as heretofore quoted from the supplementary proceedings, placed the "lending or giving or however you want to put it" at $10–12,000; then $20–25,000, and then "I wouldn't be surprised, $20,000 maybe, not exactly. I would say it was somewhere around there."

In court on February 13, 1957, Bernard testified that there were no written records of loans to him from Helen, except what she had read in court from check stubs.

Specifically he then testified that the first loan, on March 18, 1946, was $5,000, not $4,500 as his wife had testified. This was for a business he wanted to go into, but did not, until months later. He was to pay it back; that was about all that was said. The second was the loan of $2,000 in 1946, toward the purchase of the Long Beach, New York, property. The third was a loan of $3,000. In answer to a question then put, he said he could recall no other specific loans.

Hearings in court were held on February 11, 12, 13 and April 3, 4 and 15, 1957.

Called on April 15, 1957 by defendants, Bernard's attention was directed to three withdrawals from Helen's account, January 3, 1947, $500; January 29, 1947, $500; and April 1, 1947, $600. He replied:

"Well, my wife and I discussed this out, and we tried to figure what these items are. To the best of our knowledge they are loans to me."

This discussion had taken place within the preceding few weeks.

Bernard continued:

"We tried to figure out what Mrs. Katz would do with such a large sum of money. I know she was drawing out $100 and $200. We remembered and remembered, and we tried to figure it out, but she cannot figure it out. We both know that she did lend me sums,—for instance, these $500 and $600. And this must be those sums.

"In this other book there is a withdrawal,—Long Beach Federal Savings & Loan Association.[8] There is a withdrawal on December 20, 1949, of $500 that Mrs. Katz says she loaned me. On February 1st, following that, $50. Now, that one I have narrowed down to where exactly that was used. I remember exactly that $500 and the $2000. The $500 Mrs. Katz wanted me to put a deposit[9] on some land, and the $2000 was to take title[10] to that land."

\* \* \* \* \* \*

" \* \* \* Now these are not the only loans. These are the only ones I can clarify."

Therefore the maximum in alleged loans that Helen attempts specifically to

---

8. The account was in the name of Helen Katz as Trustee for her son, Stevan. The apparent gross irregularity of the use of these funds was raised by counsel for Levanne. Neither Helen nor Bernard testified to any repayment to the trust.

9 and 10. Although immediately conclusively classified by Bernard as loans, the quoted language is at least as consistent with an investment by Helen.

identify is $10,000, and Bernard, at the last hour, $14,200.

### Repayments.

The testimony with respect to alleged repayments is at least equally unsatisfactory.

In the examinations before the United States Commissioner, Bernard testified that he "gave" his wife the bulk of the bonus money he received from Kamet and Sunnyside. Whenever he "got" his hands "on any additional money" he gave it to his wife.

In those examinations Helen testified that as to repayments they had "a very casual sort of money arrangement. He just gives me money." Her attorney refused to permit her to answer further questions on repayment.

In court, Helen referred to Bernard's salary from Kamet and Sunnyside, some of which he had "given" her in return for money she had "lent" or "given" him. Sometimes he would say "Here's something toward what I owe you"; sometimes he would suggest that such amounts be lent to the corporations.[11] The first substantial repayments were in 1955, from Bernard's quarterly salary checks.[12] She could not tell the amount of the repayments "exactly"; she had no record, and would have to take her husband's word.

Helen admitted receiving in her personal account $15,033 from Bernard in 1955 and 1956.[13] About $10,000 of this was in repayment of loans. She further testified that of this amount (whatever it was) received from Bernard, she lent Kamet $5,000 on April 28, 1956. Ber-

nard contradicted this, and testified that regardless of Helen's recollection and regardless of what Kamet's books might show,[14] this $5,000 was intended to be, and was, applied as part payment for the home Kamet was building for Bernard and Helen.

Helen also testified that on January 8, 1955, she lent to Kamet $3,250 and to Sunnyside $4,000 of money received from her husband, who told her that the business needed it, so it was "relent" to the corporations.

Bernard in court testified that he could not recall the "breakdown" or amounts of repayments to Helen. Of amounts turned over to Helen since 1954, $10,000 was in repayment of loans, as to which repayments there were no books or records; the balance was not repayment.

As to the amounts received by Helen from Bernard, regardless of whether they are to be classed in whole or in part as repayment of loans, or as gifts, investments, contributions, or for living expenses, the testimony again is far from satisfactory. Bernard received from Kamet and Sunnyside as gross compensation for services, $17,550 in 1954, $22,250 in 1955, and $1,800 in 1956; a total of $41,600. Before the Commissioner, Bernard testified that "some went into a joint bank account and some was given to my wife"; he did not know how much was turned over to her. "Bonuses" paid quarterly, and amounting to the "greater part" of his salary were turned over to her. They were put "in her bank account" as distinguished from their joint account. Of the $17,550 drawn in 1954, "$9,000 or $10,000, I am not sure" was

11. Before the United States Commissioner, Helen testified that bonus checks received by Bernard from Kamet and Sunnyside were turned over to her; that she "turned them back to the corporations * * * lent them back", and that this was not pursuant to any understanding with Bernard, but "on the advice of my lawyer and my accountant."

12. Helen also testified that they had their "ups and downs"; Bernard would pay back small amounts, and reborrow.

There was no statement as to the period to which this related, and no similar testimony by Bernard.

13. Defendants' counsel stipulated $16,701.04 in checks from Bernard to Helen was deposited in Helen's special account in 1954–1955, but refused to stipulate as to the purpose or use.

14. Helen's check shows this as a loan to Kamet, "note to be issued."

deposited in the joint account,[15] and the remainder was turned over to Helen. Similarly, of the $22,250 paid Bernard in 1955, "approximately $9,000 or $10,000" was deposited in the joint account, and the remainder turned over to Helen. The regular household bills were usually paid by Helen, by check on the joint account "and occasionally you will find a smattering from her own personal account." In 1955, Bernard believed Helen contributed to the family support "in the vicinity of $1,000, maybe a little less, maybe a little more," by checks drawn on her account and deposited in the joint account.

Accordingly, defendants Bernard and Helen contend that beginning in 1946 and extending to some time prior to this suit Helen lent to Bernard various sums aggregating either $12,000, $20,000 or $20–25,000. No testimony was offered by Helen as to alleged specific loans in excess of $10,000. Bernard's original testimony also was limited to alleged specific loans aggregating $10,000. On the last day of the court trial, he attempted to enlarge this to $14,200.

The court finds by the weight of the credible evidence that at least $19,800 [16] of Bernard's earnings during 1954 and 1955 went into the private account of Helen, and that the testimony of Bernard and Helen, if believed, does not ascribe more than $10,000 of this amount to the repayment of debts. However, the court completely discredits the testimony of Bernard and Helen as to the existence of a debtor-creditor relationship between them; and further finds as a fact, and concludes as a matter of law, that even if it be assumed that a debtor-creditor relationship existed, the evidence is insufficient to establish either the amounts of the loans or of repayments. The court makes the above findings and conclusions because of the inconsistency, improbability and contradictory nature of the testimony of Bernard and Helen above set forth; upon the court's appraisal of these witnesses from their appearance and demeanor upon the stand; and upon the following additional facts:

(a) Helen and Bernard used the words "give" and "lend" interchangeably. Their counsel frankly so admitted on final argument, adding that these defendants also apparently could not distinguish between "hope" and "expect".

This inextricable confusion may, on the part of Helen, be hereditary or environmental. In the first part of her testimony in court, she stated that her father had "given" her over $20,000 since her marriage. Almost immediately, she stated that very large amounts received from him (other than an initial $5,000) were amounts she "would like to pay back." She frankly was unable to pick out what were "gifts" and what were "loans".

Helen's father, Hyman Goldberg, a retired manufacturer of apparently very substantial means, deriving his income from real estate managed by an agent, likewise tended to equate "gift" with "loan". Even as to the $2,000 check to Bernard and Helen, the proceeds of which went into the Long Beach house, his testimony was that "I gave her $2,000"; then that he "lent" it to her; that her husband's name was included as she requested, but the transaction was a loan to Helen. He then went on to describe gifts amounting to about $22,000, but added: "Many times I did not give; I lent."

The only transaction as to which the evidence might fairly be said to establish a loan from Goldberg was a Western Union Money Order for $5,000 on March 1,

---

15. Later changed to $9,000, because of taxes. 1954 income taxes were withheld. The withholding was $1,760.59 short for 1955, which was paid out of Helen's personal bank account. However, Bernard testified in court that a refund of $926.44 was received for overpayment of 1954 taxes. He did not recall the disposition of this refund.

16. $17,550 minus $10,000, or $7,550, in 1954; $22,250 minus $10,000, or $12,250, in 1955. If the smaller estimates of deposits of $9,000 each year in the joint account be used, then $21,800 of Bernard's earnings during 1954 and 1955 went into Helen's private account.

1954. Even as to this, his testimony was that the money was lent to Helen to lend to Bernard; Helen and Bernard were positive it was not intended to be lent to Bernard.

(b) On February 12, 1957, Helen had testified to unfamiliarity with a number of recent financial matters. She laughingly explained that it might seem unusual for her not to have greater familiarity with figures, since she had a "B.S. in Economics." The next day, under questioning by her counsel, she stated she had meant: "B.S. in *Home* Economics."

(c) In the course of the supplementary proceeding, plaintiff attempted to attach a certificate standing in the name of Bernard, and endorsed by him, for 50 shares of the class B stock of Kamet, representing one-half the voting stock issued and outstanding. Some question was raised as to the effectiveness of the attachment. Counsel for plaintiff appeared in chambers to apply for an injunction against the transfer or disposition of the certificate by Bernard. Counsel for defendants came as far as the ante-room, but, on hearing the word "injunction", left. A temporary restraining order was issued as prayed against "disposing, transferring or negotiating said stock certificate." On the Sunday before resumption of supplementary proceedings a meeting of stockholders (but apparently not of the Board of Directors) of Kamet was held and three hundred additional shares of voting stock were issued, one-half to Helen and one-half to her associate in Kamet. Helen understood this was because plaintiff "had commandeered a certain percentage of the stock and we would no longer be fully protected in that instance." She did not know what if anything she was supposed to pay for the 150 shares, or how, if at all, she was to pay.

It is hard to reconcile this action with Bernard's testimony that Kamet stock was not worth much; he would doubt if as much as $500.

(d) Helen was quite inconsistent as to when she learned of the instant suit. She knew the Levanne-Deland job had not been finished, and that there was unpleasantness; Bernard had told her of the March 19, 1954 agreement in suit after it had been signed; but she did not (progressively) know of the suit until May 25, 1955, when she was asked for a check for lawyer's retainer; or until March 10, 1956, when another lawyer's check was issued; or until the supplementary proceedings in July 1956; or until just a few months before the trial in February 1957.

(e) Bernard was president and a director of Sunnyside. In the supplementary proceedings he denied any familiarity with or ability to understand the financial records of that company. Familiarity or unfamiliarity were, however, elastic concepts. On July 12, 1956, he had been asked by plaintiff's counsel if Sunnyside had made a profit on a certain project, to which he had replied in the affirmative. Then followed:

"Q. Will the books of the corporation show that profit? A. If books do. I don't know. Do books reflect profits?"

On July 23, 1956, the Commissioner was inquiring as to certain bonuses, and asked:

"The Commissioner: The books didn't show a profit?

"The Witness: Surely the books showed a profit * * * "

(f) In the examination on July 12, 1956, Bernard was asked if anyone owed him any money, except Weinberg, and if he was a party to any contract or arrangement from which he could hope to realize anything. His answers were in the negative. In court on February 13, 1957, Bernard, called by plaintiff, testified that he had no assets on March 19, 1954. On April 4 and 5, 1957, Bernard testified on behalf of defendants. On April 15, 1957, he was cross-examined as to an agreement dated March 17, 1954 between Bernard, Helen, Nathan Metz (Nathan) and Selma Metz (Selma), and Sunnyside. In the Agreement, Bernard "makes" a number of "representations

and warranties" with respect to Sunnyside, its capitalization, its ownership of land; that Bernard had received a first mortgage and building loan commitment covering 39 homes, in the amount of $8,000 per loan, and a commitment for permanent financing; that he had erected a model house; that he had advertised said house for sale and had obtained written commitments for 30 houses and deposits on 10 more; and that the model house had "received the approval of all the various town and municipal departments." The Agreement also contained a guarantee by Helen and Bernard as to the cost and selling price per house. Bernard answered that "these representations are made by me * * * as agent on behalf of Mrs. Katz."

However, the agreement also provides that Bernard was to be elected a director and President of Sunnyside; that the stockholders would continue so to vote their stock; and Bernard and Nathan agreed "to devote to the business of the corporation all of their time as shall be necessary * * *" Bernard and Nathan were to draw equal amounts for their services, as decided by the Board of Directors. Selma and Helen were "not to be active nor participate in the business of the corporation."

Nathan and Selma agreed to pay $5,000 for 50 shares of stock to be issued to Selma and to lend the corporation $25,000. Nathan and Selma also acknowledged that Helen had "contributed assets to the corporation, valued for the purposes hereof" at $20,000, of which $5,000 should be "allocated to the capital of the corporation and represents the purchase price of the" 50 shares of capital stock issued to Helen, the balance of $15,000 to be "treated as a loan to the corporation, to be repaid as hereinafter provided." This provision for repayment is as follows:

"F. Both of the respective loans in the amounts of Fifteen Thousand ($15,000.00) Dollars and Twenty-five Thousand ($25,000.00) Dollars shall bear interest at the rate of six (6%) percent per annum. Both

loans shall be entered upon the books of the corporation and shall be repaid in multiples of One Thousand ($1,000.00) Dollars simultaneously in the ratio of two to Nathan and Selma and one to Bernard and Helen."

The significance of this agreement is heightened by Bernard's testimony that he handles everything for his wife; and that (at least the $5,000) credit to Helen represented work done by Bernard on behalf of Helen, for which Bernard expected compensation. "I think I have done a fairly good job of building up her assets." Helen's testimony was that Bernard organized Sunnyside; saw that construction was carried on; saw that everything was done she could not do; neither was *then* paid for their time.

In their final argument, defendant's counsel, seeking to explain the source of Helen's investments and disbursements, referred to the repayment to her by Sunnyside of loans of $20,000. Insofar as this was pursuant to the agreement of March 17, 1954, $15,000 of this should have been to *Bernard and* Helen.

(g) Counsel for defendants attempted to minimize Bernard's statement in court that he did not believe he would ever put his alleged indebtedness to his wife "on a financial statement as a liability", by claiming that he had never given a personal financial statement. This, if true, would not seem to the court to alter the significance of Bernard's appraisal of the nature of his financial dealings with his wife. However, on supplemental proceedings he testified that in connection with a "personal loan" to Helen and Bernard they "furnished * * * a brief financial statement", of which no copies were available.

(h) As has been noted, Bernard in the supplementary proceedings testified that living expenses were paid out of the joint account; that Helen may have paid a "smattering", in the nature of $1,000 a year, out of her personal account.

With their brief, filed after the closing of the testimony, counsel for defendants

filed an affidavit of Helen and Bernard that their living expenses in 1955 were $13,010.93 of which $4,757.43 was from the joint account; $1,094.50 was from Helen's Special Account; and $7,159.00 was cash expenditures. The cash expenditures were based upon "their independent recollections."

More than one-half the alleged expenditures were not from the joint account, as Bernard had testified; and the particulars in the affidavit purport to be to the penny; while there is *no* record of alleged repayments.

(i) The complete indifference as to, or lack of foundation for, the claim of loans and repayments is shown by Bernard's testimony on the last day of trial. He was asked if his testimony in the supplementary proceedings that he placed $9–10,000 each year, minus withholding taxes, in the joint account, and the balance was paid to Helen personally, was correct. His answer was:

"If it is written down there, then I guess that is what I said. If it is correct—I think certain things have come out now that bear it out,— then it is correct. If that is what the figures come to, then it is correct. If you ask me to give you a definite figure, Mr. Weisman, I can't do it out of my head. I will check the records for you, if you give me the records."

That Bernard, ten months after making his claim of loans and repayments, was still unable to speak with reasonable certainty on these critical points, shows either callous indifference, or the lack of reliable records. Neither commends itself to the court.

The court, for the reasons given, having discredited the testimony of Bernard and Helen as to their alleged debtor-creditor relationship, and as to amounts with respect thereto, it is perhaps unnecessary to speculate as to the nature of the amounts disbursed by Helen that found their way into various enterprises. However, to the court it appears that the general rationalization of Helen and Bernard was that if the venture was successful, it was an investment by Helen; if unsuccessful, a loan to Bernard. Consistent with this are the agreement of April 17, 1954, with its recital of an otherwise unidentified contribution by Helen of $20,000 to Sunnyside, of which $15,000 was to be treated as a loan to be repaid Helen and Bernard (but in fact, to the extent repaid, going to Helen alone); the turning over by Bernard to Helen of "bonuses" to be lent back to the corporations; and Bernard's testimony in the supplementary proceedings that Helen "gives me money to work with * * *"; that she "has been lending or giving or however you want to put it, money to go into various building ventures and do other things * * *" and "I doubt if I have repaid or given her as much as I have spent or lost of her's going into business"; "She has always had some money and when it came to this money for Sunnyside, what she didn't have she borrowed herself *to go into and push me into it.*" (Emphasis supplied.)

Proceeds of Long Beach Property.

As heretofore developed, Helen and Bernard took title to a piece of property in Long Beach, New York, in 1946. The source of $2,000 of the down payment of $4,000 is disputed, the testimony permitting the conclusion that this $2,000 was a gift by Helen's father to Helen and Bernard; or to Helen and contributed by her; or a gift to Helen and by her lent to Bernard to put into the purchase. If $2,000 were lent by Helen to Bernard, defendants do not claim that any repayment has been made, either expressly, or through the $10,000 of the some $20,000 going into Helen's personal account from Bernard.

Payments of principal and interest were out of Bernard's "earnings" and Helen's "pocket";[17] or "in effect" from Bernard's earnings.[18]

17. Bernard's testimony on supplementary proceedings.

18. Helen's testimony in court, first day.

---

The property was sold in 1955 for $16,500 (including $1,000 for the furniture) producing $12,698.10 net. In the supplemental proceedings Bernard testified that the proceeds, "our money", were put into Helen's "personal account for the sole purpose of building and furnishing our new home." In the same proceedings Helen likewise testified that the proceeds were put into her own personal checking account "to take care of our new house."

The settlement sheet for the closing as of June 20, 1955, shows that $2,000 was paid on the signing of the contract (date not given) and checks for $7,060.70, $2,700, $800, $137.40 and $25.85 were issued at the closing. Helen's personal accounts show a deposit of $2,000 on March 24, 1955,[19] and $7,060.70 on June 21, 1955. The personal account also shows the drawing of a check to Hyman Goldberg in the amount of $5,000 on July 8, 1955, and a check to S. Walter Katz in the amount of $1,000 on July 12, 1955.

Helen's individual savings account shows a deposit on June 21, 1955, of $3,602.35, which is very close to the sum of the closing checks less the one of $7,060.70.

Helen testified in court that the proceeds of the Long Beach property were intended to be put into an account for the new home, but her father and father-in-law "pressured" her, and so she repaid $6,000 of loans by them to her personally and solely. Bernard testified that these repayments were made after discussion between Helen and him; and upon the understanding that when Helen came into possession of more money, she would replace these repayments; and that existing "equities" held by Helen were adequate to replace these payments.

Title to the new home in Maryland was initially taken in the name of Helen only.

At the supplemental proceedings, counsel for defendants insisted that title of record was in the names of Bernard and Helen, as tenants by the entirety. After the hearing on July 12, 1956, Bernard examined the deed and found it to be in Helen's name only. He so testified on July 23, 1956, and stated that on the advice of counsel "we are changing over the deed so it will be shown as tenants by the entirety as it should have been."

At the trial, it was developed that title to five lots had been taken in the name of Helen G. Katz and Selma Metz. The tract was redivided into four lots, and title to Lot No. 11, the one in question, was by deed dated January 28, 1955, and recorded January 31, 1955, from "Selma Metz and husband Nathan Metz", conveyed to Helen G. Katz in fee simple. The deed contained the indorsement "no consideration", and no stamps were affixed.

At the trial the records of the title company handling the transfers were introduced through its "receptionist", who was authorized to accept "orders and directions." She was not familiar with the file, or able to state if it were in chronological order.[20] In the file, the application dated January 18, 1955, indicates that a first trust loan on Lot 11 was to be executed by "Bernard W. & Helen G. Katz." An interim Title Insurance Binder, dated January 26, 1955, addressed to a mortgage loan correspondent, calls for "Conveyances in proper form to vest title, as to Lot 11 of subject property, in Bernard W. Katz and wife, Helen G. Katz, as Tenants by the Entirety", and for a Deed of Trust from them. However, the interoffice form for the preparation of the deed calls for Helen G. Katz as the sole grantee, and the deed was so drawn.[21]

19. Plaintiff's counsel in their brief state that this was the down payment on the contract. Defendants' counsel have not taken issue with this.

Helen's personal checking account shows a deposit of $2,010.58 on May 18, 1955, but this is not reflected on the bank ledger cards.

20. The settlement clerk was not available, his whereabouts being unknown.

21. Counsel for defendants stated that Bernard was billed by the title company. In fact, the bill is to Nathan Metz and Bernard W. Katz, and an adjustment check issued after the settlement was sent to them.

By conveyance dated October 20, 1956 and recorded January 8, 1957, Lot 11 was conveyed by Helen G. Katz and Bernard W. Katz to John V. Truver, unmarried, and by him to "Bernard W. Katz and wife, Helen G. Katz * * * as Tenants by the Entirety * * *" No reference with respect to these conveyances (which are on the title company's printed forms) appears in the title company file.

Of some possible bearing on the whole question of ownership is the fact that policies for $7,500 Fire Insurance and Extended Coverage on Contents; Comprehensive Personal and Residence Liability; $1,000 Burglary Coverage on Personal Effects at Residence and $1,000 Theft Coverage away from Residence; and Plate Glass Insurance stand in the name of Bernard alone; and a policy for $28,000 Fire Insurance and Extended Coverage on Dwelling stands in the name of Bernard W. Katz and Helen G. Katz.

Counsel in this case devoted a substantial amount of time and effort to the questions of the nature and incidents of the tenancy of the Long Beach property, and to the law of tenancy by the entirety in Maryland.

Plaintiff contends that under New York law at least one-half the proceeds of the Long Beach property would be subject to attachment, even if that property had been held by Helen and Bernard as tenants by the entirety, under Bartkowaik v. Sampson, 1911, 73 Misc. 446, 133 N.Y.S. 401, 404:

> "It appears that the interest of the judgment debtor as to a tenancy by the entirety may be sold on execution; and in such a case it has been held that the purchaser takes as a tenant in common, but subject to the wife's right of survivorship."

See also, Stewart v. Stewart, 1955, 208 Misc. 795, 144 N.Y.S.2d 637, 639; Finnegan v. Humes, 1937, 252 App.Div. 385, 299 N.Y.S. 501, affirmed 1938, 277 N.Y.

682, 14 N.E.2d 389; Infante v. Sperber, 1946, 187 Misc. 9, 61 N.Y.S.2d 76, reversed on other grounds 1946, 271 App. Div. 896, 67 N.Y.S.2d 82.

Plaintiff further contends that upon sale of real property held as tenants by the entirety, the owners become tenants in common of the proceeds, since New York does not recognize a tenancy by the entirety in personal property. Franklin Square National Bank v. Schiller, 1950, 202 Misc. 576, 119 N.Y.S.2d 291; Secrist v. Secrist, 1954, 284 App.Div. 331, 132 N.Y.S.2d 412, affirmed without opinion, 1955, 308 N.Y. 750, 125 N.E.2d 107.

In oral argument during the progress of the case, defendants' counsel, by way of anticipation, had urged the controlling effect of the Bartkowaik decision, supra. In their memorandum after the completion of testimony, they primarily take the position that the court need deal only with the law applicable to the proceeds of the Long Beach property; that the law of Maryland is the applicable law. They contend that "Personal property, as well as real property, may be owned by husband and wife as tenants by the entireties" (Arnold, Tenancy by the Entireties and Creditors' Rights in Maryland, 9 Md. L.Rev. 291, 293 (1948)) and that property, real or personal, held by the entireties is not subject to execution by creditors of one spouse only. Jordan v. Reynolds, 1907, 105 Md. 288, 66 A. 37, 9 L.R. A.,N.S., 1026; Ades v. Caplin, 1918, 132 Md. 66, 103 A. 94, L.R.A.1918D, 276; Keen v. Keen, 1948, 191 Md. 31, 60 A.2d 200. Defendants then claim that when Bernard and Helen "brought the proceeds of the Long Beach house into Maryland and when they put those proceeds into their present house in Maryland", neither the fund nor the house could be attached by the creditors of only one spouse. This of course assumes that the proceeds of sale in New York can be traced into the Maryland house, which is not established by the evidence.[22] They admit, however, that "If Helen and Ber-

---

22. It also assumes that the registry of title in Helen alone, through the supplementary proceedings and until just before the trial began, was simply a "mistake".

nard Katz committed an actual fraud in transferring the proceeds of the Long Beach house into Maryland and the Maryland house, then the money so used insofar as it formerly belonged to Bernard Katz, would be subject to the claim of Levanne." [23] They claim, however, that the sale in New York and the move to Maryland were free of any fraudulent intent.

Plaintiff contends that the evidence clearly establishes that the proceeds of the New York house were transferred to Helen. They also assert, which the court finds as a fact, that the transfers of these proceeds were not in repayment of any alleged prior indebtedness. From this they argue that under the Uniform Fraudulent Conveyance Act, Maryland Code of Public General Laws (1951 Ed.), Article 39B, Secs. 4, 5, 6 and 7, the transfer constituted a gift, and a fraudulent conveyance, of Bernard's one-half interest therein, or $6,349.05.

The court finds and concludes that whatever might have been the effect of the holding or deposit of the proceeds of the sale of the Long Beach house in the joint names of Helen and Bernard, whether or not specifically designated as a tenancy by the entirety, the proceeds were not so held or deposited. Insofar as the evidence permits positive identification, they went into accounts standing in Helen's name alone. That there was a joint account in the names of Helen and Bernard, and that the funds were not deposited therein, seems highly significant to the court. The failure to follow the obvious, forces the defendants to rely upon the claim that the equivalent is effected by a deposit in Helen's accounts upon the understanding that such amounts were to be used solely for the purchasing and furnishing of a house in Maryland for Helen and Bernard. Apart from the facts that title was not initially taken in the joint names and that insurance policies with respect thereto were taken in Bernard's name alone, is the further controlling fact that these funds,

under the sole legal control of Helen, were used by her to discharge what both Helen and Bernard claim were Helen's private debts; and that Helen's personal accounts would not have permitted the payment of such personal debts of hers without the use of these proceeds.

The court therefore finds and concludes that of the proceeds of the sale of the Long Beach house, Bernard transferred to Helen, without consideration and subject to her own control, one-half thereof, or $6,349.05.

### Financial Condition of Bernard and Helen in 1954.

Helen testified that Bernard had been in financial difficulties over a period of years; in 1955, 1956 and 1957, but she did not think in 1954, although she knew he was not able to make any "repayments" to her before January 1955.

Bernard testified that on March 19, 1954, he had no assets, property or securities, and no income except his salary; that he had never had any "great assets" beyond salaries; that he had been unable to repay Helen before he received monies from Sunnyside; and that the only reason he did not make payments under the March 19, 1954 agreement with Levanne was that he did not have the money.

Bernard further testified that Helen had probably realized no profits before 1954.

### Conclusion

■ Upon the entire record, the court finds as facts and concludes as matters of law that at times when Bernard and Helen knew that the effect thereof would be to hinder, delay and defraud creditors, and within three years prior to the institution of this suit, Bernard transferred to Helen, without consideration, in the neighborhood of $20,000 from amounts received by him as salaries and bonuses, and $6,349.05 representing Bernard's share of the proceeds from the sale of the Long Beach house and furniture; and that Helen received to her own use

---

23. Defendants' Brief, p. 54.

from Sunnyside not less than $5,000 nor more than $12,500 [24] properly payable to Bernard. The court accordingly directs the entry of judgment in favor of plaintiff against the defendant Helen G. Katz in the amount of $14,500, with interest from April 19, 1956, and costs.[25]

The foregoing opinion embodies what the court believes to be the essential findings of fact and conclusions of law. Either party is at liberty to submit requests for further or more specific findings if they so desire.

24. Bernard testified that the $5,000 allocated to the purchase price of Sunnyside stock under the agreement of March 17, 1954, between Helen, Bernard, Nathan Metz and Selma Metz, and Sunnyside, represented work done by him, for which he expected compensation. Under this same agreement, $15,000, treated as a loan, was to be repaid to "Bernard and Helen."

25. While the court has rejected the claims of Helen and Bernard as to loans in the neighborhood of $20,000 and repayments of "approximately" $10,000, even if their testimony were credited, the excess, with one-half the Long Beach proceeds and even the minimum $7,500 from Sunnyside (one-half of $15,000) would more than cover the amount of the judgment, together with all repayments by Helen to relatives by blood or marriage. It thus becomes unnecessary to consider defendants' contentions that the court should not set aside payments to one creditor (Helen) in order that another creditor (Levanne) can be paid.

The statement in the preceding paragraph of this note is made to eliminate any claim that the court overlooked any contention of defendants; and further so that if any other court should disagree with this court's appraisal of the "loan and repayment" evidence, adequate findings would still remain for the judgment for the plaintiff against Helen. This is not intended to weaken in any degree the court's finding that the testimony of Bernard and Helen is not entitled to credence —on which point and finding the court is entirely free of any doubt.